# United States Court of Appeals
## For the First Circuit

No. 99-2085

RAYMOND P. BOIVIN,
Plaintiff, Appellee,

v.

LT. DONALD BLACK,
Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Morton A. Brody, U.S. District Judge]

Before

Selya, Circuit Judge,

Wallace,* Senior Circuit Judge,

and Boudin, Circuit Judge.

Diane Sleek, Assistant Attorney General, with whom Andrew Ketterer, Maine Attorney General, and Paul Stern, Deputy Attorney General, were on brief, for appellant.
Stuart W. Tisdale, Jr., with whom Mary A. Davis and Tisdale & Davis, P.A. were on brief, for appellee.

September 5, 2000

**SELYA, Circuit Judge.** The Prison Litigation Reform Act of 1995 (PLRA), 42 U.S.C. § 1997e (Supp. II 1996), altered the legal landscape in regard to several types of civil actions brought by prison inmates. Certain of these changes curtailed the amount of attorneys' fees that a prevailing prisoner-plaintiff could expect to obtain from his vanquished opponent. One such provision involves suits for money damages; when a prisoner secures a monetary judgment in a civil action covered by the PLRA, the statute caps the defendants' liability for attorneys' fees at 150% of the judgment. See id. § 1997e(d)(2).

This appeal raises the novel question of whether the "monetary judgment" cap applies to nominal damage awards. Contrary to the district court, we hold that it does. We proceed to reject the plaintiff's alternative argument that the cap, so construed, is unconstitutional. Consequently, we set aside the lower court's order granting a more munificent counsel fee than the statute allows and remand with instructions to reduce that award to $1.50.

## I. BACKGROUND

Raymond P. Boivin, a pretrial detainee housed at Maine Correctional Institution—Warren, sued correctional officer Donald Black following an incident in which Boivin lost consciousness after being locked in a restraint chair, his mouth covered by a

towel.[1]  On January 20, 1999, a jury found that Black, who was in charge at the time, had violated Boivin's due process rights, but awarded Boivin only $1.00 in nominal damages.  Following entry of the judgment, Boivin moved for an award of $3,892.50 in attorneys' fees.  Black opposed the motion, arguing that section 1997e(d)(2) capped attorneys' fees at $1.50 (150% of the monetary judgment).

The trial court ruled that the term "a monetary judgment," as used in the PLRA, did not include a judgment for nominal damages and, accordingly, held the fee cap inapplicable.  See Boivin v. Merrill, 66 F. Supp. 2d 50, 51 (D. Me. 1999).  The court rested its decision on two grounds.  First, it found that applying the PLRA's percentage-based fee cap to a nominal damage award would lead to an absurd result — exemplified here by Boivin's counsel being entitled to a maximum stipend of $1.50 despite having tried the case to a successful conclusion.  See id.  Second, the court posited that applying the PLRA in so mechanistic a fashion would discourage lawyers from accepting meritorious prisoner civil rights suits.  See id.  Finding no proof in the PLRA's legislative history that Congress intended

---

[1]Boivin also sued several other defendants, but all of them have long since departed from the litigation.  We therefore treat the case as if Black had been the sole defendant from the outset.

to create such a disincentive, the court decreed that the plain meaning of the provision must yield. See id. The court proceeded to award the full amount of attorneys' fees requested. See id. at 52. Black appeals from this determination.

## II. ANALYSIS

In order to frame the issues on appeal, we deem it useful to start with an overview of the parties' positions. As a threshold matter, Boivin maintains that this appeal is untimely. Black demurs. Next, Boivin asseverates that the fee cap should not apply to nominal damage awards because that application would lead to anomalous results. Black counters that the plain meaning of section 1997e(d)(2) requires its application to nominal damage awards, and that, in all events, it is the failure to apply the fee cap to such awards that would promote anomalies. Finally, Boivin asserts that if the PLRA fee cap applies to nominal damage awards, the statute violates the guarantee of equal protection found in the Due Process Clause of the Fifth Amendment.[2] Black disagrees, averring that the statute, so construed, is rationally related to legitimate

_____

[2]Unlike the Fourteenth Amendment, the Fifth Amendment does not contain an Equal Protection Clause. The Fifth Amendment's Due Process Clause, however, prevents the federal sovereign from practicing unjustifiable discrimination. See Schlesinger v. Ballard, 419 U.S. 498, 500 n.3 (1975); Bolling v. Sharpe, 347 U.S. 497, 499 (1954).

governmental ends. We address each of these three sets of conflicting contentions in the discussion that follows. Throughout, we apply de novo review. See Inmates of Suffolk County Jail v. Rouse, 129 F.3d 649, 653 (1st Cir. 1997).

### A. The Timeliness of the Appeal.

Boivin's claim that Black failed to appeal within the thirty-day window of opportunity provided by Federal Rule of Appellate Procedure 4(a)(1)(A) is baseless. The lower court entered the disputed order on August 12, 1999. The thirty-day period began the next day. See Fed. R. App. P. 26(a)(1). Simple arithmetic, confirmed by a glance at last year's calendar, indicates that the thirtieth day fell on September 11, 1999. Because that day was a Saturday, the thirty-day period was automatically extended to Monday, September 13. See Fed. R. App. P. 26(a)(3) (specifying that the last day of the appeal period automatically extends to the next day if the last day "is a Saturday, Sunday, [or] legal holiday"). Black filed his notice of appeal on that date. Hence, the appeal was timely. See id.

### B. The PLRA Fee Cap.

In the American civil justice system, the spoils that belong to the victor ordinarily do not include payment of

attorneys' fees.  See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247 (1975).  Except when a statute or an enforceable contractual provision dictates otherwise, litigants generally pay their own way.  See id. at 257.  Congress has the power, however, to revise this schematic, and if it elects to do so, it may delineate both the circumstances under which attorneys' fees are to be shifted and the extent of the courts' discretion in that respect.  See id. at 262.  Furthermore, this power may be exercised selectively, that is to say, Congress may "pick and choose among its statutes and . . . allow attorneys' fees under some, but not others."  Id. at 263.

In perhaps the most striking use of this power to date — the Fees Act, adopted in 1976 — Congress gave the courts discretion to award reasonable attorneys' fees to prevailing civil rights litigants.  See 42 U.S.C. § 1988(b) (Supp. II 1996).  Congress later enacted other statutes that hewed roughly to this prototype.  See, e.g., City of Burlington v. Dague, 505 U.S. 557, 562 (1992) (noting that many federal statutes that shift attorneys' fees share similar language); Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 562 (1986) (noting that more than 100 federal statutes provide for attorneys' fees).  In enacting the PLRA, Congress deviated from this pattern, choosing to place some explicit limitations

on the fees that courts can award to prisoners' lawyers in civil cases:

>(1) In any action brought by a prisoner who is confined to any jail, prison, or other correctional facility, in which attorney's fees are authorized under section 1988 of this title, such fees shall not be awarded, except to the extent that—
>>(A) the fee was directly and reasonably incurred in proving an actual violation of the plaintiff's rights protected by a statute pursuant to which a fee may be awarded under section 1988 of this title; and
>>(B)(i) the amount of the fee is proportionately related to the court ordered relief for the violation; or
>>(ii) the fee was directly and reasonably incurred in enforcing the relief ordered for the violation.
>(2) Whenever a monetary judgment is awarded in an action described in paragraph (1), a portion of the judgment (not to exceed 25 percent) shall be applied to satisfy the amount of attorney's fees awarded against the defendant. If the award of attorney's fees is not greater than 150 percent of the judgment, the excess shall be paid by the defendant.
>(3) No award of attorney's fees in an action described in paragraph (1) shall be based on an hourly rate greater than 150 percent of the hourly rate established under 3006A of title 18, for payment of court-appointed counsel.
>(4) Nothing in this subsection shall prohibit a prisoner from entering into an agreement to pay an attorney's fee in an amount greater than the amount authorized under this subsection, if the fee is paid by the individual rather than by the defendant pursuant to section 1988 of this title.

42 U.S.C. § 1997e(d) (footnotes omitted).

The particular limitation around which this appeal revolves relates to monetary judgments. When a prisoner-plaintiff garners a monetary judgment, section 1997e(d)(2) imposes a ceiling on the defendants' liability for attorneys' fees equal to 150% of the amount of that judgment. This appeal raises the question of whether a nominal damage award counts as "a monetary judgment" within the purview of section 1997e(d)(2).

We begin, as we must, with the language of the statute. See Bonilla v. Muebles J.J. Alvarez, Inc., 194 F.3d 275, 277 (1st Cir. 1999). We assume that the words that Congress chose to implement its wishes, if not specifically defined, carry their ordinary meaning and accurately express Congress's intent. See Rouse, 129 F.3d at 653-54. If the gist of the statute is obvious and the text, given its plain meaning, produces a plausible scenario, "it is unnecessary — and improper — to look for other signposts . . . ." United States v. Charles George Trucking Co., 823 F.2d 685, 688 (1st Cir. 1987).

While section 1997e(d)(2) is awkwardly phrased, its import and its essence are transparently clear: "[w]henever a monetary judgment is awarded" in an action covered by the PLRA and the prevailing party seeks attorneys' fees, the defendant shall pay such fees up to a maximum of 150% of the judgment

amount, and no more.[3]  Since an award of $1.00 is just as much a monetary judgment as an award of $1,000,000, the plain language of the statute makes the fee cap applicable to such an award.  This reasoning becomes especially compelling when one reflects that, although nominal damage awards long have been commonplace in civil rights cases, see, e.g., Farrar v. Hobby, 506 U.S. 103, 107 (1992); Carey v. Piphus, 435 U.S. 247, 266 (1978); O'Connor v. Huard, 117 F.3d 12, 14 (1st Cir. 1997); Maldonado Santiago v. Velazquez Garcia, 821 F.2d 822, 829 (1st Cir. 1987), section 1997e(d)(2) neither makes any express exception for nominal damage awards nor excludes from its sweep judgments of less than "X" dollars.

In a Briarean effort to blunt the force of this logic, Boivin argues that Congress could not have intended so eccentric a result.  Capping attorneys' fees at $1.50 for a prevailing plaintiff who has won a nominal damage award, he tells us, serves to discourage counsel from accepting meritorious prisoners' rights cases and thereby frustrates prison reform litigation.  We agree with Boivin that the plain-meaning

[3]This language contrasts with section 1997e(d)(1)(B)(i), which deals with other types of judgments in prisoner cases. That section requires any attorneys' fees awarded in such cases to be proportionally related to the relief obtained.  In section 1997e(d)(2), Congress presumably decided to take advantage of the precision available when relief is limited to money damages and to define proportionality in more specific terms.

-10-

doctrine is not a categorical imperative, and that the unambiguous text of a statute may yield if its application tends to produce absurd results. See United States v. Ron Pair Enters., Inc., 489 U.S. 235, 242 (1989); see also Greenwood Trust Co. v. Massachusetts, 971 F.2d 818, 825 (1st Cir. 1992) ("[A] court must always hesitate to construe words in a statute according to their apparent meaning if to do so would defeat Congress's discovered intendment."). This exception, however, is to be employed cautiously, see Rouse, 129 F.3d at 655, and it does not apply at all in this case.

Congress enacted the PLRA out of a concern that prisoner litigation, much of it frivolous, was wasting taxpayer money and clogging the courts. See, e.g., 142 Cong. Rec. S10576 (daily ed. Sept. 16, 1996) (statement of Sen. Abraham); 141 Cong. Rec. S7526 (daily ed. May 25, 1995) (statement of Sen. Kyl). Congress could well have reasoned that applying the fee cap to nominal damage awards would encourage both prisoners and members of the bar to weigh the likely value of claims before proceeding to court, thus reducing the overall number of prisoner suits and easing the perceived burden of prisoner litigation on the justice system. One can argue with the policy behind such a legislative choice, but one hardly can classify

the end result of that policy — measured in the large, and not by the occasional anomalous outcome — as absurd or chimerical.

Indeed, exempting nominal damage awards from the cap on attorneys' fees, as Boivin urges, itself would run an equally great (or greater) risk of bringing about bizarre results. Under such a regime, a prisoner who had won a judgment of $1,000 in compensation for a physical injury suffered in the course of a constitutional violation could be awarded a maximum of $1,500 in attorneys' fees, but a prisoner subjected to the same violation who sustained no physical injury and was awarded $1.00 in nominal damages would face no such limitation. There is no hint in the record that Congress wished to foster these kinds of inequities. We hold, therefore, that Congress, in enacting section 1997e(d)(2), meant what it said. The statutory cap on attorneys' fees applies to all monetary judgments, including nominal damage awards.[4]

### C. **The Constitutionality of the Fee Cap.**

---

[4]We add a caveat. In this case, the plaintiff sought and received only monetary relief. Thus, the fee cap applies. In a case in which the court orders non-monetary redress (say, an injunction) along with a monetary judgment, the fee cap contained in section 1997e(d)(2) would not restrict the total amount of attorneys' fees that the court could award. In such a "hybrid" case, the court would be free to take into account all the provisions of section 1997e(d).

We turn next to the constitutionality of the PLRA's cap on attorneys' fees. Two of our sister circuits recently have addressed the same general question. The Ninth Circuit has upheld the cap against a constitutional challenge. See Madrid v. Gomez, 190 F.3d 990, 996 (9th Cir. 1999). The Third Circuit, sitting en banc, split evenly on the issue. See Collins v. Montgomery County Bd. of Prison Inspectors, 176 F.3d 679, 686 (3d Cir. 1999) (en banc), cert. denied, 120 S. Ct. 932 (2000). This court has not yet spoken to the question.

Like the challengers in Madrid and Collins, Boivin grounds his claim of unconstitutionality in concepts of equal protection. See supra note 2. The centerpiece of his argument is that section 1997e(d)(2) treats prisoner civil rights litigants differently from all other civil rights litigants: whereas a non-prisoner civil rights litigant who wins only a nominal damage award can receive substantial attorneys' fees under 42 U.S.C. § 1988, see, e.g., Wilcox v. City of Reno, 42 F.3d 550, 557 (9th Cir. 1994) (affirming award of $66,535 in attorneys' fees to section 1983 plaintiff who had secured a $1.00 damage award), the fee cap deprives a prevailing prisoner civil rights litigant of the possibility of any comparable emolument.

In light of the Supreme Court's recent pronouncement in <u>Farrar</u>, the contrast that Boivin seeks to depict may be more apparent than real. <u>See</u> 506 U.S. at 115 ("When a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, the only reasonable fee is usually no fee at all." (citation omitted)). Leaving that point to one side, the first step in evaluating his claim is to determine the appropriate level of scrutiny. We take that step and then proceed to the constitutional question.

1. **The Level of Scrutiny.** Typically, a law will withstand an equal protection challenge if it bears a rational relationship to a legitimate governmental end. <u>See</u> <u>Vacco</u> v. <u>Quill</u>, 521 U.S. 793, 799 (1997). This level of scrutiny intensifies, however, if the law infringes a fundamental right or involves a suspect classification. <u>See</u> <u>id.</u> Boivin puts forth two reasons why the PLRA fee cap, which draws a line between prisoners and non-prisoners, should receive such heightened scrutiny. First, he declares that prisoners are a suspect class. Second, he maintains that the fee cap impermissibly burdens the fundamental right of access to the courts.

We need not linger long over Boivin's first suggestion. From a constitutional standpoint, prisoners simply are not a

-14-

suspect class.  See Webber v. Crabtree, 158 F.3d 460, 461 (9th Cir. 1998) (per curiam) (holding that prisoners are not a suspect class); Zehner v. Trigg, 133 F.3d 459, 463 (7th Cir. 1997) (calling the idea that prisoners constitute a suspect class "completely unsupported").  Thus, heightened scrutiny cannot be justified on this basis.

Boivin's second suggestion requires a somewhat longer answer.  It is axiomatic that prisoners have a constitutionally-protected right of meaningful access to the courts.  See Bounds v. Smith, 430 U.S. 817, 821 (1977).  This means that prisoners must have a reasonably adequate opportunity to bring before the courts claims that their constitutional rights have been violated.  See id. at 825.  To ensure this opportunity, correctional authorities must "assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law."  Id. at 828, distinguished by Lewis v. Casey, 518 U.S. 343, 351 (1996).  Boivin asserts that, without counsel, prisoners have little chance of meaningfully presenting their claims to the courts, and that the PLRA fee cap therefore interferes with the right of access by destroying the only real incentive for lawyers to take prisoners' civil rights cases.

Boivin's arguments are wrong on the law. The constitutionally-protected right of access to the courts is narrow in scope. See Lewis, 518 U.S. at 360 (explaining that constitutional concerns are satisfied as long as prisoners receive "the minimal help necessary" to present legal claims). To illustrate, the right of access to the courts does not extend to enabling prisoners to litigate with maximum effectiveness once in court. See id. at 354. Similarly, the right of access to the courts does not require the provision of counsel in civil cases. See Lassiter v. Department of Soc. Servs., 452 U.S. 18, 26-27 (1981); DesRosiers v. Moran, 949 F.2d 15, 23 (1st Cir. 1991). A statute which, like section 1997e(d)(2), does nothing more than limit the availability of an attorney paid for by the target of a prisoner's suit does not implicate the right of access to the courts in any cognizable way. Cf. Rouse, 129 F.3d at 660 (explaining that "while there is a constitutional right to court access, there is no complementary constitutional right to receive or be eligible for a particular form of relief").

Boivin's arguments also are wrong on the facts. First and foremost, the suggestion that prisoners who proceed pro se do not have a meaningful opportunity to prosecute their claims is highly debatable. While pro se litigants are not exempt from procedural rules, courts are solicitous of the obstacles that

-16-

they face.  Consequently, courts hold pro se pleadings to less demanding standards than those drafted by lawyers.  See Haines v. Kerner, 404 U.S. 519, 520 (1972) (per curiam); Instituto de Educacion Universal Corp. v. United States Dep't of Educ., 209 F.3d 18, 23 (1st Cir. 2000).  By the same token, courts endeavor, within reasonable limits, to guard against the loss of pro se claims due to technical defects.  See, e.g., Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990).  The net result is that pro se litigants sometimes enjoy stunning success.  See Jon O. Newman, Pro Se Prisoner Litigation: Looking for Needles in Haystacks, 62 Brook. L. Rev. 519, 519 n.2 (1996) (collecting representative cases in which prisoners acting pro se have won significant victories).

In all events, the PLRA fee cap does not make it impossible for a prisoner to secure the services of a lawyer. Cynics and naysayers notwithstanding, we are reluctant to conclude that all attorneys accept or reject prisoners' cases solely on the basis of financial considerations.  Moreover, prisoners may hire attorneys with their own funds.  See 42 U.S.C. § 1997e(d)(4) ("Nothing in this subsection shall prohibit a prisoner from entering into an agreement to pay an attorney's fee . . . .").  Then, too, the PLRA contains other provisions that allow for differential compensation (including shifted fees

not subject to the section 1997e(d)(2) cap, <u>see</u> <u>supra</u> note 4) where injunctive or declaratory relief is obtained. <u>See</u> 42 U.S.C. § 1997e(d)(1). Finally, the PLRA does not eliminate all prospect of shifted attorneys' fees even in cases that involve only money damages. After all, the statutory cap allows for an award of attorneys' fees in an amount up to 150% of a monetary judgment — which is 150% more than the norm in civil litigation. We doubt that a lawyer who believes that a prisoner has a meritorious claim for damages will be deterred by that limitation.

To say more on this topic would be supererogatory. We agree with Judge O'Scannlain that, in the last analysis, "[t]he PLRA does not restrict access to the courts; at most, it restricts prisoners' access to the most sought-after counsel who insist on their going rate for representation." <u>Madrid</u>, 190 F.3d at 995. Heightened scrutiny is, therefore, inappropriate in this case.[5]

---

[5]At any rate, a prisoner must show actual injury in order to demonstrate a violation of the right of access to the courts. <u>See</u> <u>Lewis</u>, 518 U.S. at 349. The <u>Lewis</u> Court defined actual injury as "a nonfrivolous legal claim [being] frustrated or . . . impeded." <u>Id.</u> at 353 (footnotes omitted). Boivin's claim was neither frustrated nor impeded by the PLRA fee cap. On the contrary, he secured the services of able counsel and won his case. Consequently, he has not suffered an actual injury that would allow him to claim a violation of his fundamental right of access to the courts.

**2. Rationality Review.** Since the PLRA fee cap neither involves a suspect classification nor infringes on the fundamental right of access to the courts, we analyze its constitutionality under the rational basis test.

Rationality review in equal protection cases "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." FCC v. Beach Communications, Inc., 508 U.S. 307, 313 (1993). Rather, an inquiring court must ask whether "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." Heller v. Doe, 509 U.S. 312, 320 (1993). If "any reasonably conceivable state of facts that could provide a rational basis for the classification" exists, the classification must be upheld. Beach, 508 U.S. at 313. As long as this modest burden is satisfied, Congress's handiwork will endure "even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." Romer v. Evans, 517 U.S. 620, 632 (1996).

Consistent with these tenets, the Supreme Court has made it pellucid that a person who challenges the rationality of a statute must negate every plausible basis that conceivably might support it. See Heller, 509 U.S. at 320; Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364 (1973). Boivin

fails to discredit the legitimacy of no fewer than three purposes that are served by the cap on attorneys' fees: discouraging frivolous suits, protecting the public fisc, and bringing prisoner incentives to litigate more in line with non-prisoner incentives.[6]

We need not pause to analyze these legislative purposes separately. It suffices to say that the prison setting is <u>sui generis</u>, and Congress's choice to treat prisoners differently than non-prisoners is plainly justified by the idiosyncratic characteristics of that setting. Prisoners' living costs are paid by the public and prisoners have nowhere to go — a combination that gives them more free time than non-prisoners to pursue claims (whether or not valid). The problem of prisoner

---

[6]The legislative history provides ample evidence that Congress had these goals in mind in passing the PLRA. <u>See</u> 141 Cong. Rec. S14626 (daily ed. Sept. 29, 1995) (statement of Sen. Hatch) ("This landmark legislation will help bring relief to a civil justice system overburdened by frivolous prisoner lawsuits."); 141 Cong. Rec. S7526 (daily ed. May 25, 1995) (statement of Sen. Kyl) ("[P]risoners have all the necessities of life supplied, including the materials required to bring their lawsuits. For a prisoner who qualifies for poor person status, there is no cost to bring a suit and, therefore, no incentive to limit suits to cases that have some chance of success."); 141 Cong. Rec. H1042 (daily ed. Feb. 1, 1995) (statement of Rep. Hoke) ("[T]here is an element of the bar that makes a full-time living in contacting prisoners and then using shotgun approach lawsuits . . . . [T]he reason they do this is because [they] can actually be reimbursed their fees, all of them . . . . [W]e have said . . . you can only be paid if you win, and you can only be paid on the part that you do win on.").

litigiousness is exacerbated by the nature of prison life, as inmates tend to egg each other on. This problem is further complicated by the constitutionally-protected right to a certain level of legal assistance, see Bounds, 430 U.S. at 828. Experience has shown that these and other factors, acting in concert, encourage inmates to bring large numbers of insubstantial claims — or so Congress rationally could have thought. See Madrid, 190 F.3d at 996 ("[I]t is certainly conceivable that, because of significant potential gains and low opportunity costs, prisoners generally file a disproportionate number of frivolous suits as compared to the population as a whole."). Thus, we reject Boivin's plaint that the statute distinguishes impermissibly between prisoners and other civil rights plaintiffs.

Boivin attempts to elude the inevitability of this result in a variety of ways. Citing the uncontroversial principle that a court ought not to uphold a law motivated by "a bare . . . desire to harm a politically unpopular group," United States Dep't of Agric. v. Moreno, 413 U.S. 528, 534 (1973), he insists that the fee cap discriminates against prisoners with meritorious claims, leaving them bereft of counsel so their claims can more easily be thwarted. But given the legitimate governmental purposes that underlie the fee cap, see supra, the

-21-

claim of a bare desire to harm will not fly.  Consequently, the
Moreno principle has no application on these facts.

As a fallback, Boivin deplores what he envisions as the
complete lack of fit between the means that Congress chose
(capping attorneys' fees) and the end that it sought to achieve
(reducing frivolous prisoner litigation).  Although this argument
is presented only in skeletal form, it is phrased in terms
reminiscent of the Supreme Court's decision in Lindsey v. Normet,
405 U.S. 56, 77-78 (1972) (holding unconstitutional a double-bond
requirement imposed on tenants who seek to appeal landlords'
verdicts in rent disputes on the ground that the requirement "not
only bars nonfrivolous appeals by those who are unable to post
the bond but also allows meritless appeals by others who can
afford the bond").  Thus, we assume that Boivin means that since
attorneys' fees are awarded only to prevailing parties, the fee
cap could have no possible deterrent effect on the filing of
meritless actions.

Common sense suggests that this ex post view is
untenable.  Congress presumably feared the motivating effect of
the prospect of attorneys' fees, ex ante, and the fee cap quells
that effect by capping the potential payoff.  This changes the
odds and forces both lawyer and client, out of self-interest, to
assess likely outcomes with greater care before filing a suit

-22-

that, even if nominally successful, might leave them holding a nearly empty bag.

To be sure, it can be argued that discouraging lawyers from filing frivolous prisoner suits will fail to reduce the overall number of meritless claims because the suits eschewed by lawyers simply will be prosecuted by prisoners acting pro se. In that event, all that the fee cap will achieve is a reduction in the number of frivolous cases in which prisoners are represented by counsel. While the argument that we have posited is not illogical, there are still two conceivable ways in which the fee cap might serve to reduce the aggregate number of frivolous prisoner suits. First, Congress may have believed that at least some prisoners would abandon their claims if they could not secure the services of an attorney. Second, to the extent that Congress thought lawyers were exhorting prisoners to pursue frivolous claims in the hope that lightning would strike — that, say, a runaway jury would hand down a favorable verdict or a sympathetic judge would couple a smidgen of relief with a large fee award — the fee cap would tend to curtail that behavior, thereby reducing the overall number of frivolous suits in the system. Recognizing that rationality review is highly deferential to legislative choices, see Beach, 508 U.S. at 313, these possibilities are sufficient to sustain the statutory fee

cap.  "Under the rational basis test, duly enacted socioeconomic legislation should be upheld so long as <u>any</u> set of facts could suffice to establish a rational relationship between the law and the government's legitimate objectives."  <u>Montalvo-Huertas</u> v. <u>Rivera-Cruz</u>, 885 F.2d 971, 978 (1st Cir. 1989).

Nor does Boivin's analogy to <u>Lindsey</u> compel a different result.  The case before us differs from <u>Lindsey</u> in two important respects.  First, unlike the double-bond requirement, the cap on attorneys' fees is not a barrier to court access, but a limitation on relief:  the double-bond requirement operated directly to bar appeals by individuals who could not afford the extra cost, whereas the fee cap only affects how claims are presented and does not preclude any prisoner from actually bringing a claim.  Second, the <u>Lindsey</u> Court found a very poor correlation between the double-bond requirement and the goal of reducing frivolous appeals.  <u>See</u> 405 U.S. at 78.  The fee cap fits much more snugly with the goal of reducing the volume of frivolous suits because it has the principal effect of encouraging both prisoners and lawyers who are mulling whether to bring covered cases to ask if the game is worth the candle, given the relief available.

Let us be crystal clear.  We do not suggest that there is a seamless fit between section 1997e(d)(2) and the goals that

Congress aspired to achieve. However, rational basis review does not require a perfect accommodation between means and ends. See Heller, 509 U.S. at 321. Because a cap on attorneys' fees, particularly when linked with the requirement that the prisoner contribute part of the award to the payment of the fee, see 42 U.S.C. § 1997e(d)(2), conceivably may discourage prisoners and their counsel from filing frivolous or low-value suits, we think that the fit is close enough to pass constitutional muster. See Metropolis Theater Co. v. City of Chicago, 228 U.S. 61, 69 (1913) ("The problems of government are practical ones and may justify, if they do not require, rough accommodations . . . .").

## III.  CONCLUSION

We need go no further. For the reasons elucidated herein, we hold that PLRA § 1997e(d)(2) applies to nominal damage awards and that, as applied, the statute does not offend the Fifth Amendment because there is a rational relationship between the fee cap and a clutch of legitimate governmental purposes. Accordingly, we vacate the lower court's award of attorneys' fees and remand for the setting of a fee that comports with section 1997e(d)(2).

**Vacated and remanded.  No costs.**