**F I L E D**

PUBLISH

**January 25, 2006**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

RALPH ROBBINS,

        Plaintiff - Appellee,

    v.

LARRY CHRONISTER, in his
personal and official capacity,

        Defendant - Appellant,

-----------------------------

UNITED STATES OF AMERICA,

        Intervenor.

No. 02-3115

---

**ON REHEARING EN BANC FROM AN APPEAL
FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NO. 97-CV-3489-DJW)**

---

Patrick Matthew Waters, Assistant Counsel (Kenneth J. Moore and F. Charles
Dunlay, Assistant Counsel, with him on the briefs), Unified Government of
Wyandotte County/Kansas City Kansas Legal Department, Kansas City, Kansas,
for the Defendant - Appellant.

Larry J. Leatherman, Palmer, Leatherman & White, Topeka, Kansas, for the
Plaintiff - Appellee.

Jonathan H. Levy, Attorney (Barbara L. Herwig, Attorney, Peter D. Keisler,
Assistant Attorney General and Eric F. Melgren, United States Attorney, with him

on the briefs), Appellate Staff, Department of Justice, Washington, D.C., for the Intervenor.

---

Before **TACHA,** Chief Judge, **SEYMOUR, EBEL, KELLY, HENRY, BRISCOE, LUCERO, MURPHY, HARTZ, O'BRIEN, McCONNELL & TYMKOVICH,** Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

While incarcerated at the Federal Correctional Institution in Greenville, Illinois, Ralph Robbins filed a civil rights claim under 42 U.S.C. § 1983 against police officer Larry Chronister based on an incident predating his imprisonment. The district court appointed an attorney to assist him in pursuing the claim. After a three-day bench trial the district court awarded him nominal damages of $1. The Prison Litigation Reform Act (PLRA) limits the attorney-fee award in civil-rights suits filed by prisoners to 150% of the money judgment. *See* 42 U.S.C. § 1997e(d). The district court, however, awarded a $9,680 fee, ruling that it would be absurd to apply the fee limitation to suits on claims arising before the prisoner was incarcerated. Mr. Chronister appealed the fee award. A divided panel of this court affirmed, agreeing with the district court that applying the plain language of § 1997e(d) would be absurd. Rehearing the matter en banc, we now hold that § 1997e(d) applies and Mr. Robbins's attorney-fee award is limited to $1.50.

## I.    BACKGROUND

In December 1995 Officer Chronister, returning home from work in his personal truck, recognized Mr. Robbins sitting in his car at a gas station in Kansas City, Kansas. He knew that there were five outstanding traffic warrants for Mr. Robbins's arrest. After pulling into the gas station and parking his truck behind Mr. Robbins's car, Officer Chronister approached the driver's side door of Mr. Robbins's car with his baton in his hand. He identified himself and ordered Mr. Robbins out of the car. Mr. Robbins began to back the car toward Officer Chronister's truck. Officer Chronister swung his baton into a car window, shattering it, and attempted to pull Mr. Robbins from the car. Mr. Robbins managed to maneuver the car away from Officer Chronister's truck, and tried unsuccessfully to accelerate on the icy pavement. His car spun around the parking lot, eventually fish-tailing toward Officer Chronister. As the car approached him, Officer Chronister shot at its hood and windshield. Mr. Robbins was able to drive off but wrecked the car a few blocks away. He was taken to the University of Kansas Medical Center for treatment of three gunshot wounds.

Mr. Robbins later pleaded guilty to attempted aggravated assault on a law enforcement officer and was incarcerated at the Greenville prison. While incarcerated he filed a pro se civil rights complaint under 42 U.S.C. § 1983,

alleging that Officer Chronister had used excessive force, in violation of the Fourth Amendment. The district court appointed counsel for him. After a bench trial the district court ruled that Officer Chronister's use of deadly force in firing the shots was reasonable under the Fourth Amendment, but that breaking Mr. Robbins's car window with a baton was not. Because Mr. Robbins was not physically injured by the use of the baton, the district court awarded him nominal damages of one dollar, a determination he does not appeal.

Mr. Robbins filed a motion for attorney fees under 42 U.S.C. § 1988(b), which allows the district court to award a reasonable attorney fee to a prevailing plaintiff in a § 1983 action. Officer Chronister opposed the motion, arguing that the plain language of § 1997e(d) of the PLRA caps Mr. Robbins's attorney fee at 150% of his damages, or $1.50, because he was a prisoner when he filed suit. The district court declined to apply the PLRA cap, holding that applying the cap in these circumstances would produce an absurd result; in its view, Congress could not have intended the statute to apply to meritorious civil rights claims that arose before a prisoner's confinement. The court awarded Mr. Robbins $9,680 in fees and $915.16 in expenses. Officer Chronister appealed.

## II.    DISCUSSION

We review issues of statutory construction *de novo*. *United States v. Oberle*, 136 F.3d 1414, 1423 (10th Cir. 1998). The PLRA provides in relevant part:

> (1) In any action brought by a prisoner who is confined to any jail, prison, or other correctional facility, in which attorney's fees are authorized under section 1988 of this title, such fees shall not be awarded, except to the extent that–
> (A) the fee was directly and reasonably incurred in proving an actual violation of the plaintiff's right protected by a statute pursuant to which a fee may be awarded under section 1988 of this title; . . . .
>
> (2) Whenever a monetary judgment is awarded in an action described in paragraph (1), a portion of the judgment (not to exceed 25 percent) shall be applied to satisfy the amount of attorney's fees awarded against the defendant. If the award of attorney's fees is not greater than 150 percent of the judgment, the excess shall be paid by the defendant.

42 U.S.C. § 1997e(d) (footnotes omitted). The statutory language may be inartful, but appellate courts have consistently interpreted the statute to limit a defendant's liability for attorney fees to 150% of the money judgment. *See, e.g., Royal v. Kautzky*, 375 F.3d 720, 725 (8th Cir. 2004); *Walker v. Bain*, 257 F.3d 660, 667 (6th Cir. 2001) (citing cases).

Mr. Robbins does not contest that the statute's plain language imposes a 150% fee cap if (1) the plaintiff was a prisoner at the time he brought the action and (2) the plaintiff was awarded attorney fees under § 1988. It is undisputed that Mr. Robbins was a prisoner when he filed his § 1983 action and that the district court entered judgment in his favor by awarding him one dollar in nominal

damages and reasonable attorney fees under § 1988(b). Accordingly, the plain statutory language limits the award of attorney fees to $1.50.

Mr. Robbins argues, however, that the district court was correct in ruling that it would be absurd to apply the cap in this case. The clear intent of Congress, he contends, was to control the torrent of litigation by prisoners concerning their treatment by prison authorities, not to deter prisoner suits arising from allegations of preincarceration misconduct. Why, he asks, should a prisoner's attorney-fee award be limited just because the prisoner did not get around to filing suit until he was incarcerated? After all, he could have filed suit earlier, and then the fee cap would not have applied. To explain why we reject this argument, we first address the absurdity doctrine and then we discuss its application to the PLRA.

The United States Supreme Court has long recognized the absurdity doctrine as a means to avoid applying the unequivocal language of a statute. But the doctrine has been strictly limited. Chief Justice Marshall wrote:

> [I]f, in any case, the plain meaning of a provision, not contradicted by any other provision in the same instrument, is to be disregarded, because we believe the framers of that instrument could not intend what they say, it must be one in which the absurdity and injustice of applying the provision to the case, would be so monstrous, that all mankind would, without hesitation, unite in rejecting the application.

*Sturges v. Crowninshield*, 17 U.S. 122, 202-03 (1819). This court has said that an interpretation of a statute is absurd if it leads to "results 'so gross as to shock the

general moral or common sense.'" *United States v. Newsome*, 898 F.2d 119, 121 n.3 (10th Cir. 1990) (quoting *Crook v. Harrelson*, 282 U.S. 55, 60 (1930)).

The absurdity doctrine should not be confused with a useful technique for resolving ambiguities in statutory language. When statutory language reasonably admits of alternative constructions, there is nothing remarkable about resolving the textual ambiguity against the alternative meaning that produces a result the framers are highly unlikely to have intended. We choose the reasonable result over the "absurd" one. Application of this technique is not what Mr. Robbins is suggesting. He acknowledges that § 1997e(d) cannot be read to permit more than a $1.50 attorney-fee award in this case.

One claiming that the plain, unequivocal language of a statute produces an absurd result must surmount a formidable hurdle. It is not enough to show that the result is contrary to what Congress (or, perhaps more accurately, some members of Congress) desired. In other words, we cannot reject an application of the plain meaning of the words in a statute on the ground that we are confident that Congress would have wanted a different result. Instead, we can apply the doctrine only when it would have been unthinkable for Congress to have intended the result commanded by the words of the statute—that is, when the result would be "so bizarre that Congress could not have intended it," *Demarest v. Manspeaker*, 498 U.S. 184, 190-91 (1992) (internal quotation marks omitted).

Accordingly, whether some members of Congress (or even a committee) expressed a view contrary to the statute's language is beside the point. For the same reason, we cannot reject the plain meaning of statutory language just because Congress may not have anticipated the result compelled by that language in a particular case. As the Supreme Court has stated, "[I]t is not, and cannot be, our practice to restrict the unqualified language of a statute to the particular evil that Congress was trying to remedy—even assuming that it is possible to identify that evil from something other than the text of the statute itself." *Brogan v. United States*, 522 U.S. 398, 403 (1998). The Court "acknowledge[d] the reality that the reach of a statute often exceeds the precise evil to be eliminated." *Id.* Thus, references by Mr. Robbins to floor debate on the PLRA, a singularly perilous method of discerning congressional intent in any event, *see, e.g., Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 457 n.15 (2002) (rejecting reliance on two statements in Congressional Record), cannot affect our analysis. It is simply irrelevant whether any member of Congress affirmatively wished to limit attorney fees in a case like this.

The Supreme Court's recent *Barnhart* decision illustrates two important features of the modern absurdity doctrine that limit its scope. *Barnhart* addressed the Coal Industry Retiree Health Benefit Act of 1992, the most recent effort to achieve solvency for coal-industry health-retirement plans established through

collective bargaining agreements over the years. The Act requires contributions to the plans from both "signatory operators" (those who have entered into retirement plans contained in collective bargaining agreements) and "related persons" (certain persons affiliated in specific ways with a defunct signatory operator). *See Barnhart*, 534 U.S. at 442-47. Under the Act, successors in interest to related persons are themselves related persons. *Id*. at 452. The dispute between Social Security Commissioner Barnhart and the coal company respondents was whether successors in interest to signatory operators are likewise "related persons." The Court, adopting the plain meaning of the Act, held that successors in interest to signatory operators are not "related persons," rejecting Commissioner Barnhart's apparent request "that the Court invoke some form of an absurd results test." *Id*. at 459.

One important factor in the Court's analysis was that no canon of construction required departure from the statute's plain meaning, as do some canons employed to avoid results that contradict longstanding traditions or fundamental legal principles—results that might be labeled "absurd." The Court wrote:

> Our role is to interpret the language of the statute enacted by Congress. This statute does not contain conflicting provisions or ambiguous language. *Nor does it require a narrowing construction or application of any other canon or interpretative tool. . . .* We will not alter the text in order to satisfy the policy preference of the Commissioner.

*Id.* at 461-62 (emphasis added). Examples of such interpretative tools are the presumption of a mens rea requirement for criminal offenses, *see Staples v. United States*, 511 U.S. 600, 605 (1994) ("[W]e must construe the statute in light of the background rules of the common law in which the requirement of some *mens rea* for a crime is firmly enbedded." (internal citations omitted)), and the presumption that categorical limitations periods are nonetheless "subject to equitable tolling," *Young v. United States*, 535 U.S. 43, 49-50 (2002) ("Congress must be presumed to draft limitations periods in light of this background principle." (internal quotation marks omitted)). What was once the domain of the absurdity doctrine has been narrowed by the more common use of such interpretative tools. In the absence of these background principles, a court might resort to imposing, say, a mens rea requirement on the ground that it would be "absurd" not to impose the requirement. What the language of *Barnhart* suggests is that courts should be particularly resistant to claims of absurdity when rejection of plain language cannot be justified by a recognized canon of construction or interpretative tool. *See generally,* John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387, 2465-76 (2005) (discussing background legal conventions used to interpret statutes).

The second feature of modern absurdity doctrine illustrated by *Barnhart* is the recognition that application of a court's "commonsense" view of public policy

must not override the rough and tumble of the legislative process. What would be the most "rational" legislation simply may not survive the battles necessary for enactment. In the words of Professor Manning:

> [L]egislative preferences do not pass unfiltered into legislation; they are distilled through a carefully designed process that requires legislation to clear several distinct institutions, numerous veto gates, the threat of a Senate filibuster, and countless other procedural devices that temper unchecked majoritarianism. Hence, the precise lines drawn by any statute may reflect unrecorded compromise among interest groups, unknowable strategic behavior, or even an implicit legislative decision to forgo costly bargaining over greater textual precision.

*Id.* at 2390. The result in *Barnhart* is certainly peculiar. While not imposing a contribution obligation on the purchaser of a coal operator, the Act does impose that obligation on the purchaser of a dairy farm that was affiliated with the coal operator. *See Barnhart*, 534 U.S. at 465 (Stevens, J., dissenting). Yet the Court was satisfied to note that coal operators may have objected to any expansion of their liability for retirement benefits or to the impact of successor liability "on the valuation and sale of union companies and properties," *id*. at 460, and continued:

> Where the statutory language is clear and unambiguous, we need neither accept nor reject a particular "plausible" explanation for why Congress would have written [the Act as it did]. Dissatisfied with the text of the statute, the Commissioner attempts to search for and apply an overarching legislative purpose . . . . Dissatisfaction, however, is often the cost of legislative compromise. . . . [The Act's] delicate crafting reflected a compromise amidst highly interested parties attempting to pull the provisions in different directions. . . . As such, a change in any individual provision could have unraveled the whole.

-11-

*Id*. at 460-61. In short, courts, out of respect for their limited role in tripartite government, should not try to rewrite legislative compromises to create a more coherent, more rational statute. A statute is not "absurd" if it could reflect the sort of compromise that attends legislative endeavor.

With the above understanding of the absurdity doctrine in mind, we see that this is not a close case. We have been pointed to no canon of construction or interpretative rule that would suggest a need to depart from the statute's plain language. And even though one could argue that applying the PLRA cap to cases like this is not the most rational means for controlling litigation, such a result is certainly not outside the bounds of legitimate legislative compromise. As a brief discussion will reveal, there is simply nothing bizarre about treating prisoner suits alleging preincarceration civil-rights violations the same as prisoner suits alleging violations of civil rights during incarceration.

It is worth remembering that the American Rule is that the losing party in litigation is not required to reimburse the prevailing party's attorney fees. *See Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 602 (2001). An award of attorney fees under 42 U.S.C. § 1988 is a departure from general practice, presumably designed as an incentive to plaintiffs to engage in litigation to vindicate civil rights. Section 1997e(d) reduces that incentive in civil-rights suits by prisoners, at least for low-dollar-value claims

unlikely to result in a significant award of damages, by limiting recovery of attorney fees from the defendant to 150% of the damage award.

We see nothing absurd about reducing that incentive for *all* civil-rights claims filed by prisoners, not just those challenging conditions in prison. The balance of incentives and disincentives for filing suit is quite different for prisoners than for free persons, regardless of the subject matter of the claim, whether it be prison conditions or preincarceration conduct. Free persons must weigh the value of a possible victory in court against the burdens on their time and wallets in pursuing litigation. Prisoners, in contrast, have time in abundance, do not need money for their own necessities, and are entitled to free legal assistance or access to legal materials. And what may be perceived as burdens to free persons, such as taking time for depositions or court appearances, may well be considered an attractive change of scenery for prisoners. Given these circumstances, there is nothing absurd about applying the restriction on attorney-fee awards to prisoner civil-rights claims arising before incarceration as well as to such claims arising during incarceration.

Therefore, we reverse the district court's award of attorney fees and remand for an award limited to $1.50. We can understand the frustration that the district court must have felt after having requested Mr. Leatherman to represent Mr. Robbins. Certainly, Mr. Leatherman's performance at oral argument before

this court indicates how fortunate Mr. Robbins was to have such a compelling

advocate on his side. But any temptation we may have to reward Mr. Leatherman

for his service is overcome by our duty to respect an Act of Congress.