PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-8148

JAMEY LAMONT WILKINS,

Plaintiff - Appellant,

v.

OFFICER GADDY,

Defendant – Appellee,

UNITED STATES OF AMERICA,

Intervenor.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Robert J. Conrad, Jr., Chief District Judge. (3:08-cv-00138-RJC-DSC)

Argued: September 18, 2013          Decided: November 1, 2013

Before WILKINSON, MOTZ, and FLOYD, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Motz and Judge Floyd joined.

**ARGUED**: David Alexander Strauss, NORTH CAROLINA PRISONER LEGAL SERVICES, Raleigh, North Carolina, for Appellant. Kimberly D. Grande, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. Jonathan Heuer Levy, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Intervenor. **ON BRIEF**: Roy Cooper, North Carolina Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for

Appellee. Anne Tompkins, United States Attorney, Charlotte, North Carolina, Stuart F. Delery, Principal Deputy Assistant Attorney General, Barbara L. Herwig, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Intervenor.

WILKINSON, Circuit Judge:

Plaintiff is a state prisoner who challenges the constitutionality of 42 U.S.C. § 1997e(d)(2), a part of the Prison Litigation Reform Act of 1995 (PLRA), as violating his right to equal protection of the laws under the Fifth Amendment's Due Process Clause. The challenged provision caps the attorneys' fee award that a successful prisoner litigant may recover from the government in a civil rights action at 150 percent of the value of the prisoner's monetary judgment. The district court upheld the constitutionality of this provision, and we now affirm.

I.

A.

Jamey Wilkins, the plaintiff, was a prisoner in the custody of the North Carolina Department of Correction (now the North Carolina Department of Public Safety). On June 13, 2007, he was incarcerated at the Lanesboro Correctional Institute in Polkton, North Carolina, when Officer Alexander Gaddy, the defendant, escorted another inmate past his cell. Wilkins and Officer Gaddy became embroiled in an argument that resulted in Officer Gaddy opening Wilkins's cell and physically subduing him. According to Wilkins, Officer Gaddy lifted and then slammed him to the concrete floor where, once pinned, Officer Gaddy punched,

3

kicked, kneed, and choked Wilkins until the officer was removed by another member of the corrections staff. Wilkins alleged that the altercation caused him a bruised heel, back and neck pains, headaches, and other health complications.

B.

Following the incident, Wilkins filed a pro se civil rights suit under 42 U.S.C. § 1983 claiming that Officer Gaddy "maliciously and sadistically" assaulted him with "excessive force" in violation of the Eighth Amendment. The district court dismissed the suit when it concluded that Wilkins had failed to state a claim upon which relief could be granted because he had not alleged more than a de minimis injury. We affirmed. Wilkins v. Gaddy, 308 F. App'x 696 (4th Cir. 2009).

The Supreme Court granted Wilkins's petition for certiorari and reversed, holding that the "core judicial inquiry" in Eighth Amendment claims is not focused on the "extent of the injury" sustained by the plaintiff but rather the "nature of the force" used in the purported assault. Wilkins v. Gaddy, 559 U.S. 34, 39 (2010). Although it remanded for further proceedings, the Supreme Court "express[ed] no view on the underlying merits" of Wilkins's claim and noted that "the relatively modest nature of his alleged injuries will no doubt limit the damages he may recover." Id. at 40.

4

Wilkins obtained representation upon remand from North Carolina Prisoner Legal Services and proceeded to trial. The jury returned a verdict holding Officer Gaddy responsible for using excessive force against Wilkins, but declined to award compensatory or punitive damages. Instead, it awarded only nominal damages of $0.99. The district court entered judgment for Wilkins in the amount of $1. Wilkins, as the prevailing party, filed a motion under the fee-shifting provision of 42 U.S.C. § 1988 for $92,306.25 in attorneys' fees. While acknowledging that fee awards in prisoner lawsuits are capped by § 1997e(d)(2), Wilkins argued that this section of the PLRA violated the Fifth Amendment's equal protection component by irrationally treating prisoner and non-prisoner litigants differently.

The magistrate judge to whom the matter had been referred calculated the award pursuant to § 1997e(d)(2) and recommended that Wilkins's lawyers be awarded $1.40.[*] Wilkins reiterated his equal protection challenge before the district court, but the court found § 1997e(d)(2) to be a constitutional exercise of legislative authority. Specifically, the district court held

---

[*] The magistrate judge applied the fee cap in § 1997e(d)(2) and found that the maximum permissible award was $1.50. Next, because § 1997e(d)(2) also requires that some of the plaintiff's judgment apply toward his attorneys' fee award, the magistrate judge reduced Wilkins's fee award to $1.40.

5

that the classification between prisoners and non-prisoners in § 1997e(d)(2) was rationally related to legitimate government interests, including reducing marginal prisoner lawsuits and protecting the public fisc. It further noted that the rational basis standard of review commands judicial deference to legislative acts unless the relationship of the chosen means to the desired ends is bereft of logical support. Consequently, the district court declined to strike down § 1997e(d)(2), adopted the magistrate judge's recommendation, and awarded Wilkins's counsel $1.40 in attorneys' fees. Wilkins now appeals.

## II.

Wilkins seeks the full award of $92,306.25 in attorneys' fees for his counsel. To that end, he contends that the fee cap in § 1997e(d)(2) creates a distinction between prisoner and non-prisoner litigants that cannot stand under the Fifth Amendment. First, Wilkins does admit that courts do not review classifications involving prisoners with strict scrutiny. He asserts, however, that statutes governing inmates still require a heightened standard of review because of prisoners' unique characteristics. Second, he argues that § 1997e(d)(2) fails even ordinary rational basis review because it arbitrarily and irrationally "discriminates against prisoner civil rights

6

litigants" in that the fee cap bears "no rational relationship" to the admittedly legitimate governmental objectives at which it is aimed. Appellant's Br. 7. We are not persuaded by either contention.

A.

Government may not constitutionally deny to any person the equal protection of the laws. But this principle is not and cannot be absolute because it is a "practical necessity that most legislation classif[y] for one purpose or another, with resulting disadvantage to various groups or persons." Romer v. Evans, 517 U.S. 620, 631 (1996). Indeed, unless a statute affects a fundamental right or some protected class, courts generally accord the legislation a "strong presumption of validity" by applying a rational basis standard of review. Heller v. Doe, 509 U.S. 312, 319 (1993).

This standard is quite deferential. It simply requires courts to determine whether the classification in question is, at a minimum, rationally related to legitimate governmental goals. City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 440 (1985). In other words, the fit between the enactment and the public purposes behind it need not be mathematically precise. As long as Congress has a reasonable basis for adopting the classification, which can include "rational speculation unsupported by evidence or empirical data," the

7

statute will pass constitutional muster. <u>FCC v. Beach Commc'ns., Inc.</u>, 508 U.S. 307, 315 (1993). The rational basis standard thus embodies an idea critical to the continuing vitality of our democracy: that courts are not empowered to "sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations." <u>City of New Orleans v. Dukes</u>, 427 U.S. 297, 303 (1976).

Wilkins accepts the fact that we should apply rational basis review to analyze the fee cap in § 1997e(d)(2). However, he would have us apply a "'more searching form of rational basis review,'" Appellant's Br. 9 (quoting <u>Lawrence v. Texas</u>, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring)), because he contends that the rational basis standard is in reality a "spectrum" and that "prisoners possess certain characteristics which warrant the court to apply the rational basis review in a less rigid manner," Appellant's Br. 8-9. These include prisoners' relative inability to protect themselves in the political process and the historical discrimination against prisoners in employment, housing, and welfare programs. In effect, Wilkins asks us to give less deference to legislative classifications involving prison litigants.

We do not think that sliding-scale rational basis is a permissible approach here. Our precedent clearly holds that prisoners are not a "suspect class." <u>Giarratano v. Johnson</u>, 521

8

F.3d 298, 303 (4th Cir. 2008) (internal quotation marks omitted). The Supreme Court has only applied heightened scrutiny when it finds that a particular class is "quasi-suspect" in that it possesses immutable characteristics, faces historic or ongoing discrimination, or is subject to arbitrary burdens on some basis beyond its ability to control. City of Cleburne, 473 U.S. at 439-43. Because breaking the law is a voluntary act and many prisoners will eventually be released, the "status of incarceration is neither an immutable characteristic . . . , nor an invidious basis of classification." Moss v. Clark, 886 F.2d 686, 690 (4th Cir. 1989). "Moreover, it would be ironic for the law to confer special solicitude upon a class whose members had violated it." Id. Nor is any fundamental right of access to the courts involved, for no party possesses an entitlement to a congressional declaration that its attorneys' fees in a federal lawsuit shall be borne by the non-prevailing party. See Johnson v. Daley, 339 F.3d 582, 586 (7th Cir. 2003) (en banc) (finding that there is no "fundamental right to have one's adversary, or the public treasury, defray all or part of the cost of litigation").

These considerations militate in favor of ordinary rational basis review. Several of our sister circuits have concluded that classifications involving prisoners should not receive

strict scrutiny, and their reasoning also supports the parallel conclusion that heightened scrutiny is not warranted. See, e.g., Boivin v. Black, 225 F.3d 36, 42 (1st Cir. 2000) ("[P]risoners are simply not a protected class."); Zehner v. Trigg, 133 F.3d 459, 463 (7th Cir. 1997) (finding the argument that prisoners are a protected class "completely unsupported"). We note also that the Supreme Court has used the rational basis standard when considering the constitutionality of a statute distinguishing between jailed and non-jailed persons, McDonald v. Bd. of Election Comm'rs of Chicago, 394 U.S. 802, 807-09 (1969), and has not applied heightened scrutiny to classifications involving prisoners absent another protected characteristic, such as race, see Johnson v. California, 543 U.S. 499, 505-09 (2005). Accordingly, we decline Wilkins's invitation to apply heightened equal protection scrutiny in this case.

B.

We turn now to Wilkins's rational basis challenge. When a litigant files suit in a court in the United States, he or she will typically pay the costs associated with hiring an attorney. This is the "American Rule" and it governs litigation in federal courts "absent explicit congressional authorization" to the contrary. Key Tronic Corp. v. United States, 511 U.S. 809, 814-15 (1994) (internal quotation marks omitted). Congress

10

exercised its power to partially abrogate the American Rule when it enacted the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, which granted district courts the authority to award attorneys' fees from state coffers to the prevailing party in a civil rights action. By providing lawyers with a suitable award if they could achieve success in court, this fee-shifting provision encouraged them to take civil rights cases that they otherwise might not and thus ensured "effective access to the judicial process for persons with civil rights grievances." Hensley v. Eckerhart, 461 U.S. 424, 429 (1983) (internal quotation marks omitted).

But what Congress provides, Congress can adjust or take away. It adopted the PLRA almost 20 years later in an effort to reduce the "ever-growing number of prison-condition lawsuits that were threatening to overwhelm the capacity of the federal judiciary." Anderson v. XYZ Correctional Health Services, Inc., 407 F.3d 674, 676 (4th Cir. 2005). The legislative history of the Act is replete with statements that inmate civil rights litigation consumed an undue amount of both executive and judicial resources. See Intervenor Br. of the United States 6-8 (compiling congressional statements). In an effort to address this problem, the PLRA included, among other things, limitations on attorneys' fees awards. Section 1997e(d)(2) states in relevant part that "[i]f the award of attorney's fees is not

11

greater than 150 percent of the judgment, the excess shall be paid by the defendant." While this language is "not a model of clarity," its import is apparent. Shepard v. Goord, 662 F.3d 603, 607 (2d Cir. 2011). Although § 1997e(d)(2) does not remove a district court's discretion to shift attorneys' fees, it caps awards at 150 percent of a prisoner's monetary judgment. See id. at 608 (noting that every circuit to consider § 1997e(d)(2) has construed it to impose a fee cap and holding the same). Wilkins does not contest this interpretation. But non-prisoner civil rights litigants are not subject to the fee cap; it is this distinction that Wilkins claims is unconstitutional.

Congress's goals in enacting § 1997e(d)(2) include, as noted earlier, reducing marginal or frivolous prisoner civil rights lawsuits and protecting the public fisc. See Jackson v. State Bd. of Pardons and Paroles, 331 F.3d 790, 798 (11th Cir. 2003). Wilkins agrees that these goals are legitimate, but contends that § 1997e(d)(2) is so poorly tailored to these ends that it could not possibly be expected to advance them. Overall, he insists the fee cap is a thoroughly irrational approach to the prison litigation problem. While the provision may not be the only or the optimal way of stemming baseless inmate lawsuits, we hold that Congress acted rationally in adopting it.

It was not irrational for Congress to believe that inmates have certain litigation advantages and certain incentives to file lawsuits not shared by non-prisoner plaintiffs. Inmates are provided with the necessities of life at state expense; they receive "free paper, postage, and legal assistance"; and they may have greater amounts of free time in which to prepare their claims. Roller v. Gunn, 107 F.3d 227, 234 (4th Cir. 1997). Furthermore, prisoners might see legal proceedings as a "means of gaining a short sabbatical in the nearest Federal courthouse," Anderson, 407 F.3d at 676 (internal quotation marks omitted), or as a tool to "intimidat[e] members of the prison staff," Hadix v. Johnson, 230 F.3d 840, 844 (6th Cir. 2000). Congress was entitled to conclude that this mix of advantages and incentives finds no analogue outside prison walls.

Of course, the above propositions are not indisputable, and in certain respects, prison litigants may suffer some litigation disadvantages in relation to their non-prison counterparts. But under the rational basis standard, Congress could have believed that the danger of frivolous, marginal, and trivial claims was real and that a legislative solution was required to equalize prisoner and non-prisoner litigants. And although the congruence between § 1997e(d)(2) and the goal of reducing meritless and insubstantial prisoner lawsuits may not be perfect, it does exist. Walker v. Bain, 257 F.3d 660, 670 (6th

13

Cir. 2001). A cap on attorneys' fees awards requires attorneys "to ask if the game is worth the candle" and demand greater odds of success before agreeing to represent a prisoner. Boivin, 225 F.3d at 45. If a prisoner cannot find counsel, it may dissuade him or her from bringing such a claim at all. Or so Congress might reasonably have believed.

Wilkins argues that even more basic flaws in the provision require its invalidation. He claims there is no coherent connection between § 1997e(d)(2) and limiting frivolous lawsuits because the fee cap applies only to successful cases and Congress cannot rationally disadvantage meritorious claims of constitutional violations in the name of reducing meritless litigation. But Congress could rationally have determined that limiting an attorneys' fee award incentive ex ante, before the outcome is known, prevents the filing of at least some ultimately meritless claims. Johnson, 339 F.3d at 594-95. Moreover, even though there exist other rules that discourage attorneys from bringing frivolous claims, such as sanctions under Federal Rule of Civil Procedure 11 and § 1988's requirement that "reasonable attorney's fee[]" awards go only to a "prevailing party," nowhere in the Constitution does it say that Congress is limited to a single legislative solution to a perceived social ill. Id. at 593-94.

14

It is true, as Wilkins emphasizes, that Farrar v. Hobby already holds that district courts should decline to award attorneys' fees if the prevailing party suffers only minimal harm. 506 U.S. 103, 114-16 (1992). But Farrar does nothing more than direct courts to consider the prevailing party's "extent of success" when determining the appropriate attorneys' fee award under cases subject to the fee-shifting provision in § 1988. Id. at 116 (internal quotation marks omitted). By contrast, § 1997e(d)(2) categorically limits a district court's discretion solely in prisoner civil rights lawsuits. These rules, while overlapping, are not co-extensive. Indeed, district courts after Farrar occasionally dispensed substantial attorneys' fees awards to prevailing parties even when they received only minimal judgments. See, e.g., Wilcox v. City of Reno, 42 F.3d 550 (9th Cir. 1994) (upholding an award of $66,535 in attorneys' fees because the district court properly exercised its discretion under Farrar despite a $1 judgment for the plaintiff); Jones v. Lockhart, 29 F.3d 422 (8th Cir. 1994) (upholding the district court under Farrar and awarding $10,000 in attorneys' fees to a prisoner litigant who received a judgment of $2). Even if Farrar makes the fee cap mostly redundant, as Wilkins claims, Congress is not constitutionally forbidden from enacting legislation simply because some other rule aims to resolve the same problem in a different way.

15

Wilkins further contends that the fee cap is fatally defective because it stands no chance of doing its job. It will not, in his view, dissuade prisoners from filing civil rights lawsuits; rather, they will simply proceed pro se, even if their claims are frivolous, marginal, or trivial. The precise extent to which the cap will accomplish the congressional purpose is not for us to decide, however, for Congress could reasonably conclude that at least some meritless and insubstantial lawsuits would go unfiled when prisoners find themselves required to "shoulder the entire workload" of litigating their cases. Walker, 257 F.3d at 669.

We need not tarry over Wilkins's final contention: that § 1997e(d)(2) is not a reasonable way to conserve public funds. Protection of the public fisc is a core responsibility of the legislative branch. Indeed, as to federal expenditures, the Supreme Court has affirmed Congress's control of the purse strings: "[The Appropriations Clause] is to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 428 (1990). The extent to which individual litigants should have their lawyers paid by the people involves the setting of priorities sufficiently akin to

16

the appropriations process that we are loath to interfere. Wilkins sought over $92,000 in attorneys' fees on a judgment of $1. Congress was free to conclude that fee awards so disproportionate to a monetary judgment are an unwise use of public funds.

The Supreme Court has made clear that determining attorneys' fees awards "should not result in a second major litigation." Fox v. Vice, 131 S. Ct. 2205, 2216 (2011) (internal quotation marks omitted). The simple, mathematical formula embodied in § 1997e(d)(2) rationally forestalls collateral fee litigation while ensuring that the incentive provided by an attorneys' fee award still attaches to the most injurious civil rights violations.

Our ruling upholding the fee cap in § 1997e(d)(2) is anything but novel. It is in accord with every other circuit to consider this provision of the PLRA. See Parker, 581 F.3d at 200; Johnson, 339 F.3d at 583; Jackson, 331 F.3d at 792-93; Foulk v. Charrier, 262 F.3d 687, 691 (8th Cir. 2001); Walker, 257 F.3d at 663; Boivin, 225 F.3d at 38. As noted in Shepard, 662 F.3d at 609, the "argument that [§ 1997e(d)(2) is unconstitutional] has been uniformly rejected by the circuits in which such issues have been raised." We now join those courts

and affirm the judgment of the district court upholding the constitutionality of § 1997e(d)(2).

AFFIRMED