**Mac S. HUDSON and Derick Tyler**

v.

**Kathleen DENNEHY, in her official capacity as Commissioner of the Massachusetts Department of Corrections.**

Civil Action No. 01–12145–RGS.

United States District Court,
D. Massachusetts.

July 25, 2008.

Michael Kendall, Neal E. Minahan, Jr., McDermott, Will & Emery LLP, Boston, MA, for Mac S. Hudson.

MCI Cedar Junction, Walpole, MA, pro se.

Nancy Ankers White, Richard C. McFarland, Commonwealth of Massachusetts, Department of Correction, Charles W. Anderson, Jr., Department of Correction, Boston, MA, for Kathleen Dennehy, Michael Maloney.

### *MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR AT-TORNEYS' FEES AND COSTS*

STEARNS, District Judge.

Plaintiffs Mac Hudson and Derick Tyler, state prison inmates, prevailed on a civil rights claim against Kathleen Dennehy, the Commissioner of the Massachusetts Department of Correction (DOC). After a six-day non-jury trial, the court entered partial judgment for the plaintiffs and ordered defendant to provide plaintiffs with Halal meals and access to Jum'ah services while confined in the Special Management Unit (SMU) at MCI–Cedar Junction [1] or any other similarly situated facility. Hudson and Tyler were represented by the law firm McDermott Will & Emery (McDermott), which pursuant to 42 U.S.C. § 1988 has petitioned for an award for attorneys' fees and costs.

### *BACKGROUND*

This case has an extensive procedural history, which is laid out in the court's March 5, 2008 Order After a Non–Jury Trial. *Hudson v. Dennehy*, 538 F. Supp 2d. 400, 403–405 (D.Mass.2008). The essentials are recited below.

Hudson and Tyler originally brought this action *pro se* in 2001. The wide-ranging Complaint named several prison

---

**1.** The SMU at MCI–Cedar Junction is collo- quially known as Ten Block.

officials as defendants and alleged violations of the Free Exercise Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and 103 CMR 471.00 *et seq.* In addition to prospective and declaratory relief, plaintiffs sought money damages. The case languished for some three years, until McDermott offered to serve as plaintiffs' counsel on a pro bono basis.[2] The firm was appointed on November 9, 2004.

Within months, plaintiffs filed a motion to amend the Complaint, which was allowed on May 5, 2005. The Amended Complaint challenged three DOC institutional practices: (1) a refusal to provide Halal[3] meals; (2) a ban on traditional prayer rugs; and (3) a refusal to provide access to weekly Jum'ah[4] services to inmates confined in SMUs. Six causes of action were asserted: (1) violations of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc *et seq.* (RLUIPA); (2) a free exercise claim under the First Amendment and 42 U.S.C. § 1983; (3) an equal protection claim under the Fourteenth Amendment and 42 U.S.C. § 1983;[5] (4) a religious freedom claim under art. 2 of the Massachusetts Declaration of Rights and Article XLVI of the Articles of Amendment to the Massachusetts Constitution; (5) an equal protection claim under art. 1 of the Declaration of Rights; and (6) violations of the Inmate Right of Worship Statute under Mass. Gen. Laws ch. 127, § 88, and its attendant regulations.

In light of the newly asserted counts (particularly under RLUIPA, which was not in effect at the time the original Complaint was filed), plaintiffs filed a motion seeking to resuscitate the claims relating to access to prayer rugs. Defendant opposed that motion and filed for summary judgment on May 13, 2006. On August 31, 2006, the court issued an order granting plaintiffs' motion and denying defendant's motion for summary judgment. The case proceeded to trial on three issues: plaintiffs' access to Halal meals, prayer rugs, and Jum'ah services (while confined in the SMU).

A six-day bench trial began on January 8, 2007, and was completed on February 1, 2007. The court issued its decision on March 5, 2008. *Hudson v. Dennehy, supra.* The court determined that plaintiffs' rights under RLUIPA had been violated with regard to access to Halal meals and access to Jum'ah services.[6] *Id.* at 411–412. The

---

2. The case briefly came to life in mid–2003, when plaintiffs moved for a preliminary injunction, which the court denied. A few months later, defendants filed a motion for summary judgment, which the court partially allowed. The court found that the defendants were exempt from any claims of monetary damages under qualified immunity. *Hudson v. Maloney,* 326 F.Supp.2d 206, 214 (D.Mass. 2004). The court further determined that under the test of *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), plaintiffs were not entitled to relief as a matter of law with regard to the DOC's ban on prayer rugs or its policy of assigning prisoners to kitchen service jobs on a nondiscriminatory basis.

3. Halal means that which is authorized by Islamic law (fiqh). At issue in this case is food from animals slaughtered according to certain Muslim rituals.

4. Jum'ah is a Friday group prayer that is obligatory for Muslims.

5. The equal protection claim concerned the DOC's alleged willingness to serve Kosher meals to Jewish inmates while refusing to make a similar accommodation for Muslim inmates.

6. The court's finding that plaintiffs' rights were violated under RLUIPA obviated the need to reach the federal and state constitutional questions raised by the Amended Complaint and the discrimination theories advanced under Massachusetts statutes and regulations.

court also found that plaintiffs had failed to establish that using a prayer towel instead of a prayer rug substantially burdened their right to free religious exercise.[7] *Id.*

Final Judgment issued on April 11, 2008. Defendant was ordered to

> (i) procure pre-packaged Halal meals that have been certified by a reputable Halal-certifying organization, such as the Islamic Food and Nutrition Council of America or the Islamic Society of North America; and (ii) thereafter provide such pre-packaged Halal meals to Plaintiffs at each regularly-scheduled meal for the duration of their incarceration; or (iii) shall implement an alternative method of providing daily Halal meals to Plaintiffs, including the preparation of such meals in DOC kitchens using Halal products and procedures certified by a reputable Halal-certifying organization such as the Islamic Food and Nutrition Council of America or the Islamic Society of North America.

Defendant also was required to "provide access to a closed circuit television set that displays, through sound and images, a live broadcast of such communal Jum'ah services as are regularly held on each and every Friday for the duration of their incarceration (absent a legitimate emergency or the unavailability of an authorized Imam, in which case Defendant may broadcast prerecorded Jum'ah services)." On July 17, 2008, Dennehy certified compliance with the Final Judgment.[8]

## DISCUSSION

■ Section 1988(b) provides that "[i]n any action or proceeding to enforce a provision of . . . the Religious Land Use and Institutionalized Persons Act of 2000, . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). The court's discretion to grant attorney's fees is, however, somewhat narrowed if plaintiff prevails on any significant issue in the litigation. *See Williams v. Hanover Hous. Auth.*, 113 F.3d 1294, 1300 (1st Cir.1997) (a statutory presumption "absent unusual situations"). A "prevailing party" is one who secures a "judicially sanctioned change in the legal relationship of the parties." *Buckhannon Board & Care Home, Inc. v. W.Va. Dep't of Health & Human Res.*, 532 U.S. 598, 605, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). *See also Farrar v. Hobby*, 506 U.S. 103, 111–112, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) ("A plaintiff prevails when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.").

When awarding fees to a prevailing party

> a trial court generally should employ the lodestar method to calculate fees. Under this method, a court usually should begin with the attorneys' contemporaneous billing records. *Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 295 (1st Cir.2001). The court should then subtract hours that are duplicative,

---

7. As RLUIPA accords a prisoner's choice of religious exercise a heightened degree of protection from government intrusion, it was not necessary for the court to address the prayer rug issue under a constitutional reasonableness and balancing test. *See Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

8. On the same day, Dennehy filed a notice of appeal. Dennehy challenges the Final Judgment to the extent that it requires the DOC to provide plaintiffs access to closed-circuit television broadcasts of Jum'ah services while confined in SMUs other than Ten Block.

unproductive or excessive and multiply the reasonable hours billed by the prevailing attorney rate in the community. *Id.; Lipsett v. Blanco*, 975 F.2d 934, 937 (1st Cir.1992). The resulting amount constitutes the lodestar. After calculating the lodestar, the court may then adjust the award further for any of several reasons, including the quantum of success achieved in the litigation. *Coutin v. Young & Rubicam P.R., Inc.*, 124 F.3d 331, 337 n. 3 (1st Cir.1997).

*Bogan v. City of Boston*, 489 F.3d 417, 426 (1st Cir.2007).

■ Time spent on unsuccessful claims, unless woven into the successful claim by a "common core of facts," is not compensated. *Hensley v. Eckerhart*, 461 U.S. 424, 435, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). "*Hensley* makes clear that where multiple claims are interrelated, and a plaintiff has achieved only limited success, awarding her the entire lodestar amount would ordinarily be excessive. *Hensley*, therefore, counsels that, while 'there is no precise formula for making these determinations,' a court 'may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success.'" *Andrade v. Jamestown Hous. Auth.*, 82 F.3d 1179, 1191 (1st Cir. 1996) (upholding trial court's reduction of attorneys' fees where plaintiff prevailed on only one of five claims and three of the claims were frivolous). *See also Diaz–Rivera v. Rivera–Rodriguez*, 377 F.3d 119, 126 (1st Cir.2004) (affirming a 33 percent reduction in the lodestar because of plaintiff's limited success). Cf. *Lipsett v. Blanco*, 975 F.2d 934, 940–941 (1st Cir.1992) ("[W]here it would be an 'exercise in futility' to separate out the legal services rendered for each claim, the fee should simply be determined as a function of degree of success.").

On the other hand,

[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters.

*Hensley*, 461 U.S. at 435, 103 S.Ct. 1933 (internal citation omitted).

Because the plaintiffs in this case are prisoners, their attorneys' fee petition is further subject to the fee provision of the Prison Litigation Reform Act of 1996, 42 U.S.C. § 1997e(d) (PLRA), which imposes special limitations on prisoner awards.[9] To recover fees, the prisoner must be a prevailing party under 42 U.S.C. § 1988, and the fees must be directly and reasonably incurred in proving an actual violation of the prisoner's rights. Further, the fee must be proportionately related to the court-ordered relief for the violation, or directly and reasonably incurred in enforcing the relief ordered. See 42 U.S.C. § 1997e(d)(1)(A) and (B). Finally, the hourly rate for the fee recovery must be no more than 150 percent of the hourly rate established under the Criminal Justice Act, 18 U.S.C. § 3006A (CJA), for payment of court-appointed counsel. *See*

---

**9.** Congress clearly anticipated that the PLRA would apply to RLUIPA claims: "Nothing in this chapter shall be construed to amend or repeal the Prison Litigation Reform Act of 1995 (including provisions of law amended by that Act)." 42 U.S.C. § 2000cc–2(e).

42 U.S.C. § 1997e(d)(3). *See also Martin v. Hadix*, 527 U.S. 343, 119 S.Ct. 1998, 144 L.Ed.2d 347 (1999) (reducing a fee award in accordance with the PLRA's hourly cap); *Boivin v. Black*, 225 F.3d 36, 46 (1st Cir.2000) (the PLRA's fee cap does not violate the Due Process Clause of the Fifth Amendment).

Plaintiffs seek fees in the amount of $324,632.63 and costs of $13,630.17,[10] for a total of $338,262.80.[11] In support of the petition, plaintiffs have submitted itemized and detailed contemporaneous time records and cost entries, as well as an affidavit from attorney Neal Minahan attesting to the reasonableness of the requested fees and costs. As is typical at large firms like McDermott, a number of attorneys and staff worked on the case, including summer associates and paralegals. In the fee petition, however, McDermott has submitted only those fees and costs that are associated with the core members of the litigation team (attorneys Michael Kendall,[12] Benjamin Goldberger,[13] and Minahan, and paralegals Lauren Muenzberger and Elizabeth Mueller).[14] Counsel also excluded costs and fees associated with computer research services such as Westlaw and LexisNexis.[15]

According to attorney Minahan, counsel reviewed all of the time charged to the case and eliminated all charges spent exclusively on claims that were not successful at trial. Counsel also eliminated duplicative time. Because the majority of the billing records do not distinguish between time spent on specific issues (i.e., Halal meals, prayer rugs, or Jum'ah services) counsel reduced the total number of billed hours by 15 percent to reflect the estimated amount of time spent on the unsuccessful prayer rug issue.

Defendant challenges two aspects of the petition: First, the billing for work that was not directly and reasonably related to the relief awarded in the Final Judgment, and second, the billing at hourly rates in excess of PLRA limits. I will address each in turn.

Defendant maintains that plaintiffs' petition overstates their success at trial. Plaintiffs prevailed on one of the five causes of action asserted in the Amended Complaint (the RLUIPA claim) and two of the three issues for which they originally

---

10. The costs break down to $1,681.73 for expert expenses, $107.44 for telephone/facsimile charges, $425.15 for postage/courier, $748.26 for transportation, $6,134.24 for copying, and $4,533.35 for court reporters and transcripts. Defendant does not contest the reasonableness of these costs.

11. The court notes that McDermott partners do not profit personally from an award of attorneys' fees in pro bono matters. Under the firm's policy, if fees are ultimately recovered, the firm only compensates itself for out-of-pocket expenses. The remainder of the fee award is placed in the firm's general pro bono account to be used for contributions to charitable organizations or to fund other pro bono cases.

12. Kendall, a partner in McDermott's trial department, is a former Assistant United States Attorney who has practiced law in Boston for over twenty years. He took the supervisory role in this litigation.

13. Goldberger was a third-year associate at McDermott when the firm assumed the case in 2004. He left the firm in August of 2007 to join the Suffolk County District Attorney's office. He and Minahan, who was a first-year associate in 2004, conducted the bulk of the litigation, including the trial.

14. Mueller and Muenzberg shared paralegal responsibilities in the period leading up to and during trial. Mueller also aided with the preparation of the fee petition.

15. Electronic research fees are ordinarily recoverable. *See InvesSys, Inc. v. McGraw–Hill Cos., Ltd.*, 369 F.3d 16, 22–23 (1st Cir.2004). Counsel estimates that this non-charge reduced the petition by approximately $10,000.00.

sought relief (Halal meals and Jum'ah services).[16] Defendant contends that the 15 percent reduction is too conservative to account for the role the prayer rug issue played in the litigation. For support, defendant cites the amount of discovery that plaintiffs devoted to prayer rugs, including the number of interrogatories, requests for production of documents, and requests for admissions. Defendant also points to the trial, where plaintiffs testified at length to their religious beliefs regarding prayer rugs while several prison officials testified regarding related safety and security concerns. While all of this may be true, I view the record differently.

■ After reviewing McDermott's time sheets and the billing descriptions, I find them sufficiently detailed, proportional, and directly related to the relief ordered. The records show that McDermott seeks recompense only for work related to the RLUIPA claims. Time exclusively spent on the prayer rug issue has been identified and eliminated from the fees requested. The additional 15 percent reduction to account for any excess time that counsel may have expended on the prayer rug issue that became intertwined with the Halal meals or Jum'ah services issues seems generous. Moreover, it is not clear that such entwinement actually occurred. Although the three issues shared a common legal theory—RLUIPA—the factual bases underlying each were distinct. In other words, there was no common core of facts that plaintiffs (or defendant) had to prove in order to prevail on the prayer rug issue as opposed to the issue of Halal meals or access to Jum'ah services. Further, I perceive the Halal issue to have been at the heart of this litigation from the outset.

Considerably more time was spent developing this issue at trial, and it was the only issue that required expert testimony. Accordingly, I find the 15 percent reduction to be reasonable and an accurate reflection of plaintiffs' success in the case.

■ In addition, defendant's suggestion that plaintiffs' success was limited because the court granted judgment only with respect to the RLUIPA claim is without merit. The other causes of action in the Amended Complaint were alternative theories for plaintiffs to obtain the same relief—access to Halal meals, prayer rugs, and Jum'ah services. That the court adjudged the case exclusively on RLUIPA grounds is no reflection on the extent of plaintiffs' success. It simply was unnecessary for the court to go any further. RLUIPA imposes strict scrutiny review of restrictions on a prisoner's exercise of religion. If plaintiffs could not prevail under RLUIPA, they would not have prevailed on the other constitutional and statutory causes of action, all of which were clustered under a more defendant-friendly standard. Therefore, I will make no further adjustment to the fee petition on this basis.

Defendant's second objection relates to the cap on fees imposed by the PLRA. The PLRA limits the hourly rate to no "greater than 150 percent of the hourly rate established under [the CJA] for payment of court-appointed counsel." 42 U.S.C. § 1997e(d)(3). The hourly rate for work on CJA cases in the District of Massachusetts performed between May 1, 2002, and December 31, 2005, was $90.00; from January 1, 2006, to May 19, 2007, was $92.00; from May 20, 2007, to December 31, 2007, was $94.00; and after January 1, 2008, is $100.00. McDermott's hourly rates exceed those amounts.[17]

---

**16.** Defendant counts four issues for which plaintiffs sought relief by including plaintiffs' desire to have access to Halal meals prepared by Muslims. I do not agree with defendant's math. The food-prepared-by-Muslims theory was simply one of two theories advanced by plaintiffs to get to the same result—access to Halal meals.

**17.** Over the course of the litigation, the attorneys' billable rates were as follows:

At first glance, this would appear to settle the matter—the court should cap McDermott's fees at 150 percent of the rates listed above because those rates are what was actually paid to court-appointed lawyers in CJA cases. But the statute is not written in terms of what was actually paid. Rather, the PLRA caps fees at 150 percent of the hourly rate *established* for payment of court-appointed counsel. Hourly rates for CJA cases are set by the Judicial Conference. The amount authorized by the Judicial Conference under the CJA is an hourly rate of $113 (as of September 19, 2002). Accordingly, the amounts actually paid to court-appointed counsel are not the rates "established" by the Judicial Conference; rather, they reflect a lack of adequate funding by Congress. The CJA delegates to the Judicial Conference exclusive domain over the hourly rates to be paid. 18 U.S.C. § 3006A(d)(1) ("The Judicial Conference shall develop guidelines for determining the maximum hourly rates for each circuit ... with variations by district, where appropriate, taking into account such factors as the minimum range of the prevailing hourly rates for qualified attorneys in the district in which the representation is provided and the recommendations of the judicial councils of the circuits.").

The issue is one of statutory construction that the First Circuit has yet to address.[18] As the Sixth Circuit has explained,

> [t]he statute contains no reference to congressional appropriations or to rates of compensation that are actually paid to court-appointed counsel. While congressional appropriations may place a practical limitation on the amount actually paid to court-appointed counsel, there is no language in § 3006A that expressly limits the Judicial Conference's discretion to set rates based on budgetary constraints. If Congress had wanted attorney fees under the PLRA to be based on the amount of money budgeted for payment of court-appointed counsel, it could easily have used such language rather than cross-referencing § 3006A.
>
> Moreover, in the absence of express statutory language, there is no inherent reason why attorney fees under the PLRA should be limited by the amount budgeted to pay court-appointed counsel under the CJA. Attorney fee awards in prisoner civil rights litigation are paid from the pockets of unsuccessful defendants whether they be private individuals or government entities; such fees are not paid from funds set aside by Congress to compensate court-appointed counsel under the CJA. There is no logical reason to limit fee awards in such cases to the amount of money set aside to fund the CJA.

*Hadix v. Johnson,* 398 F.3d 863, 867 (6th Cir.2005). The few Circuits to have squarely addressed the issue are divided. Joining the Sixth Circuit is the Ninth Circuit, *see Webb v. Ada County,* 285 F.3d 829, 838–839 (9th Cir.2002).[19] The Third

| | 10/1/04–<br>9/30/05 | 10/1/05–<br>9/30/06 | 10/1/06–<br>9/30/07 | 10/1/07–<br>9/30/08 |
|---|---|---|---|---|
| Minahan | $210 | $235 | $275 | $325 |
| Goldberger | $260 | $295 | $335 | N/A |
| Kendall | $530 | $560 | $585 | $635 |

18. The court has found only two decisions in this Circuit awarding attorneys' fees under the PLRA. *See Surprenant v. Rivas,* 2004 WL 1858316 (D.N.H. Aug.17, 2004); *Boivin v. Merrill,* 66 F.Supp.2d 50 (D.Me.1999), *vacated, Boivin v. Black,* 225 F.3d 36 (1st Cir. 2000). Those opinions, however, concerned the provision of the PLRA that caps an attorneys' fee award at 150 percent of any monetary judgment. *See id.* at 41 n. 4. There were no money damages awarded in this case.

19. District court opinions in other circuits adopting this approach include *Laube v. Allen,* 506 F.Supp.2d 969, 987 (M.D.Ala.2007).

Circuit stands alone in adopting the defendant's approach. *See Hernandez v. Kalinowski*, 146 F.3d 196, 201 (3d Cir.1998) (PLRA limits attorneys' fees to the hourly rate actually paid, not the rate set by the Judicial Conference).[20]

■ I find *Hadix* to be the most extensive and persuasive exposition of the issue.[21] Accordingly, this court follows the Sixth and Ninth Circuits in holding that the maximum hourly rate available to plaintiffs' counsel pursuant to the PLRA is 150 percent of the Judicial Conference's rate of $113, or $169.50 per hour.[22]

■ Paralegal work is remunerable under 42 U.S.C. § 1988. *See Missouri v. Jenkins*, 491 U.S. 274, 285, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) (the term "attorney's fee" in § 1988 "cannot have been meant to compensate only work performed personally by members of the bar."). Muenzberger billed at $185 per hour from October 1, 2006, to September 30, 2007. During that same period, Mueller billed $160 per hour, and $170 per hour from October 1, 2007, to September 30, 2008. The PLRA is silent on paralegal rates. However, it would be odd to award paralegal's fees at a rate higher than attorneys' fees. Accordingly, the court reads the

PLRA to prohibit paralegal rates in excess of $169.50, but to permit whatever lesser rate would be considered reasonable under 42 U.S.C. § 1988(b). Taking into account the prevailing market rates and prior paralegal rates approved by this court, I will award $100 per hour. *See, e.g., Access 4 All, Inc. v. Delancey Clinton Assocs., L.P.*, 2007 WL 118940, at *3 (D.Mass. Jan.8, 2007) (awarding paralegal rate of $90 per hour); *Rolland v. Romney*, 292 F.Supp.2d 268, 275 (D.Mass.2003) ($75 per hour for work done from 2001–2002); *Arthur D. Little Int'l, Inc. v. Dooyang Corp.*, 995 F.Supp. 217, 225 (D.Mass.1998) ($65 per hour for work done from 1994–1998).

This was an important and complex case that presented an issue of first impression in this Circuit. The action had been pending for nearly three years before McDermott agreed to serve as plaintiffs' counsel pro bono. Prisoner cases are notoriously unpopular among the private bar as pro bono candidates. McDermott's agreement to take this case and the commensurate risk of receiving no payment at all is commendable. Counsel had to research RLUIPA (at the time in its nascent stage), petition the court to re-open part of the case, conduct discovery, defend against a

---

**20.** District court opinions in other circuits following this approach include *Skinner v. Uphoff*, 324 F.Supp.2d 1278, 1282 (D.Wyo. 2004).

**21.** The Seventh Circuit has left open whether the appropriate fee is the rate authorized or the rate actually paid. *See, e.g., Johnson v. Daley*, 339 F.3d 582, 584 n.† (7th Cir.2003) ("To facilitate exposition, we use throughout the opinion the $90 CJA funded rate, which implies a maximum of $135 per hour under the PLRA. By employing this figure, we do not imply any view on the question whether it is the right one, or whether instead $169.50 (150% of $113) is today's cap.").

**22.** In *Boivin v. Black, supra*, the First Circuit stated that "[i]n a case in which the court orders non-monetary redress (say an injunc-

tion) along with a monetary judgment, the fee cap contained in section 1997e(d)(2) would not restrict the total amount of attorneys' fees that the court could award. In such a 'hybrid' case, the court would be free to take into account all the provisions of section 1997e(d)." 225 F.3d at 41 n. 4. Some may read the footnote to mean that the PLRA's restrictions on fee awards do not apply at all to non-monetary redress. That would be incorrect. Section 1997e(d)(2) caps attorneys' fees incurred for the sole purpose of securing monetary judgments. In contrast, as *Boivin* makes clear, whenever equitable relief is obtained, the district court is free to grant an attorneys' fee proportionally related to that relief, so long as it is within the confines of section 1997e(d)(3), that is, no more than 150 percent of the hourly rate established under the CJA.

summary judgment motion, and conduct a six-day trial. The Final Judgment was a solid result for the plaintiffs. Although the case was not brought as a class action, it involved challenges to institutional practices that are likely to impact future cases.

### ORDER

For the foregoing reasons, plaintiffs' petition for attorneys' fees and costs is *AL-LOWED* in part. McDermott is awarded fees of \$237,299.25 and costs of \$13,630.17.[23]

SO ORDERED.

---

**23.** The fees are awarded as follows:

| | Total Hours | Hourly Rate | Total Fees |
|---|---|---|---|
| Benjamin Goldberger, Esq. | 433 | \$169.50 | \$ 73,393.50 |
| Neal Minahan, Esq. | 887 | \$169.50 | \$150,346.50 |
| Michael Kendall, Esq. | 41.5 | \$169.50 | \$ 7,034.25 |
| Lauren Muenzberger | 31.75 | \$100.00 | \$ 3,175.00 |
| Elizabeth Mueller | 33.50 | \$100.00 | \$ 3,350.00 |
| | | Total | \$237,299.25 |