Albert FORD, Plaintiff,

v.

James BENDER, et al., Defendants.

Civil Action No. 07–11457–JGD.

United States District Court,
D. Massachusetts.

Aug. 17, 2012.

Stay Conditionally Granted Nov. 29, 2012.

Lisa J. Pirozzolo, Dimple Chaudhary, Emily R. Schulman, Timothy D. Syrett, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, MA, for Plaintiff.

Kevin A. Anahory, William D. Saltzman, Department of Correction, Boston, MA, for Defendants.

### MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND BILL OF COSTS

DEIN, United States Magistrate Judge.

## I. INTRODUCTION

This matter is presently before the court on the Plaintiff's Motion for Attorneys' Fees and Bill of Costs. (Docket No. 213). In May 2008, Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale") was appointed to represent the plaintiff Albert Ford, who was incarcerated in the Department Disciplinary Unit ("DDU") at MCI–Cedar Junction as a pretrial detainee, and later as a convicted inmate, without a hearing. In September 2010, summary judgment was entered in Ford's favor on his claim that his detention in the DDU without a hearing violated his constitutional rights. Following a three day jury-waived trial on the issue of damages, in January 2012, Ford was awarded $47,500 in damages and injunctive relief to declare his DDU sanction satisfied and to help him transition into the general population prior to his release from incarceration.

By their motion, WilmerHale is seeking fees in the amount of $345,542.00 and costs in the amount of $20,456.36. They contend that this is a significantly reduced amount from the hours actually expended in Ford's defense. The defendants have raised numerous legal and factual objections to the motion. For the reasons detailed herein, this court orders that the defendants pay WilmerHale attorneys' fees in the amount of $258,000.00 and costs in the amount of $20,456.36.

In so ruling, this court stresses that the quality of the work performed was excel-

lent, and that the attorneys were well-prepared, professional and dedicated to their client and the case. The reduction in the amount of fees awarded does not reflect a view that the work reported in the time sheets was not done, or that it was not done well. Rather, as detailed below, in this court's view the work on certain issues is not compensable under the PLRA and, at times, the amount of work done on certain issues was excessive, and involved more meetings and re-writes than are appropriately charged to the defendants. Nevertheless, as Judge Stearns stated in *Hudson v. Dennehy,* in language that is applicable here, "[t]his was an important and complex case that presented an issue of first impression in this Circuit. The action had been pending for [a while] before [WilmerHale] agreed to serve as [Ford's] counsel pro bono. Prisoner cases are notoriously unpopular among the private bar as pro bono candidates. [WilmerHale's] agreement to take this case and the commensurate risk of receiving no payment at all is commendable.... Judgment was a solid result for the plaintiff[ ]. Although the case was not brought as a class action, it involved challenges to institutional practices that are likely to impact future cases." *Hudson v. Dennehy,* 568 F.Supp.2d 125, 133–34 (D.Mass.2008). Counsel certainly earned the fees awarded here.

## II. *STATEMENT OF FACT*

### *Pre-trial Work*

Ford commenced this action on July 31, 2007, proceeding *pro se.* (Docket No. 1). On May 8, 2008, WilmerHale was appointed as *pro bono* counsel. (Docket No. 44). On July 11, 2008, WilmerHale filed a Second Amended Complaint, naming as defendants the Massachusetts Department of Correction; Harold Clarke, the Commissioner of Correction; James Bender, the Deputy Commissioner of the Prison Division of the DOC; Peter St. Amand, the Superintendent of MCI–Cedar Junction; Kenneth Nelson, the Assistant Deputy Commissioner, Southern Division of the DOC; and Michael Bellotti, the Norfolk County Sheriff. (Docket No. 52). Therein, Ford brought claims under 42 U.S.C. § 1983 alleging that his detention in the DDU violated his substantive due process rights under the Fourteenth Amendment (Count One) and under the Massachusetts Declaration of Rights (Count Two), his procedural due process rights under the Fourteenth Amendment (Count Three) and the Massachusetts Declaration of Rights (Count Four), his right to effective assistance of counsel under the Sixth Amendment (Count Five) as well as under the Massachusetts Declaration of Rights and state law (Count Six), his rights to equal protection under the Fourteenth Amendment (Count Seven) and the Massachusetts Declaration of Rights (Count Eight), his right to be free from "infamous punishment" under the Massachusetts Declaration of Rights (Count Nine), and various Massachusetts statutes. (Counts Ten and Eleven). He sought monetary, declaratory and injunctive relief.

Defendant Bellotti moved to dismiss the complaint against him, which WilmerHale opposed and which was denied without prejudice. (Docket Nos. 58, 62, 75). WilmerHale engaged in discovery on Ford's behalf, which included drafting and responding to discovery requests, the production and review of thousands of pages of documents, and the depositions of 10 fact witnesses. (*See* WilmerHale Mem. (Docket No. 214) at 2). According to WilmerHale, counsel had difficulty gaining access to their client, and were forced to file a motion "to compel DOC to comply with regulations governing telephone access to counsel." (Docket No. 65). The matter

was eventually resolved by agreement. (Docket No. 69).

### The Summary Judgment Motions

On September 14, 2009, Bellotti filed a motion for summary judgment (Docket No. 87), as did the DOC defendants (DOC, Clarke, Bender, Nelson and St. Amand). (Docket No. 90). Ford filed a motion for partial summary judgment on that date as well. (Docket No. 94). There was extensive briefing and oral argument.

On December 1, 2009, the court granted Bellotti's motion for summary judgment. (Docket No. 121). On September 30, 2010, 2010 WL 3860628, this court issued a decision on the remaining cross-motions for summary judgment. (Docket No. 130). Judgment was entered in accordance with this decision on November 16, 2010, 2010 WL 4781757. (Docket No. 140). This court ruled that the defendants Bender and St. Amand, acting in both their individual and official capacities, violated Ford's substantive due process rights under the United States Constitution and the Massachusetts Declaration of Rights by confining him in the DDU as a pretrial detainee as punishment for misconduct that occurred while Ford was serving a prior sentence, which had since been completed. (Docket No. 140). In addition, the court declared, based on the same conduct, that Bender, acting in both his individual and official capacities, had violated's Ford's federal and state constitutional rights to procedural due process by incarcerating Ford in the DDU without affording him a new hearing, and that Bender, in his official capacity, had violated Ford's federal and state procedural due process rights by confining Ford in the DDU following his 2008 conviction, again without affording him a new hearing. (Docket No. 140). The claims against the DOC and Clarke and Nelson were dismissed without opposition, as were Counts Five, Six, Ten

and Eleven against all defendants, and the procedural due process claims contained in Counts Three and Four against St. Amand. (*See* Docket No. 130 at n. 1). The defendants' motion for summary judgment as to the equal protection claims (Counts Seven and Eight) was denied as there were material facts in dispute.

### Subsequent Proceedings

Following the summary judgment decision, Ford filed a "Motion for Release from Unlawful Confinement" (Docket No. 132) and, on November 8, 2010, the court gave the DOC until November 16, 2010 to determine Ford's future housing placement, and until November 24, 2010 to hold a hearing in connection with any effort to confine him in a segregated unit. (Docket No. 138). On November 16, 2010, the DOC requested an extension of these deadlines, which the court granted on November 17, 2010. (*See* Docket No. 142, and Docket Entry dated 11/17/2010).

On or about November 14, 2010, Ford was given Disciplinary Report # 212833 for allegedly threatening a staff member and destroying state property, *i.e.*, using a sheet to make a "fishing line." This Report was dismissed by the DOC. On November 17, 2010, a new disciplinary report was issued, adding DDU-eligible charges and citing additional statements allegedly made by Ford. Ford denied making any of the alleged statements. (*See* Docket No. 144).

Ford requested that this court oversee his disciplinary hearing. That request was denied, although he was allowed to take discovery about the events leading to the disciplinary charge. (*See* Docket Nos. 144, 157). A DDU hearing was conducted into the disciplinary charges and, on December 15, 2010, Ford was given a 10 month DDU sanction for this offense. Ford challenged this sanction in a State Court certiorari proceeding pursuant to Mass. Gen. Laws

ch. 249, § 4, although the status of that case is unknown to this court at this time. The new 10 month DDU sanction relieved the DOC from having to make an immediate decision as to where to house Ford, as he was now deemed to be serving the 10 month sentence in the DDU.

Ford remained in the DDU for this new offense until August 4, 2011, when he completed his 10 month DDU sanction. According to the DOC, he was moved to the general population unit at the Souza–Baranowski Correctional Center ("SBCC"), a maximum-security prison located in Shirley, Massachusetts, where, to the best of this court's knowledge, he remained.

### The Trial

Prior to trial, Ford dropped his outstanding equal protection claims. (Docket No. 170 at n. 1). A three day trial was held on July 25, 26 and 27, 2011. Shortly before trial, the parties filed eleven motions in limine, some of them raising novel questions of law. The trial was limited to Ford's claim for damages and injunctive relief arising out of the violation of Ford's substantive and procedural due process rights. The plaintiff was seeking money damages for his 375 days in the DDU as a pretrial detainee, but not for any of the time that he spent in the DDU after he was convicted. While the plaintiff was improperly confined in the DDU following his 2008 conviction, the plaintiff was not entitled to damages for that period because Bender's liability for Ford's post-conviction confinement was based only on actions that the defendant took in his official, as opposed to individual, capacity. *See Hafer v. Melo,* 502 U.S. 21, 31, 112 S.Ct. 358, 365, 116 L.Ed.2d 301 (1991) (holding that state officials may be sued "in their individual capacities" for money damages under 42 U.S.C. § 1983).

Ford presented the testimony of an expert and the plaintiff himself. The defendants called five witnesses, including an expert. The parties submitted extensive post-trial proposed findings and rulings, addressing a number of novel issues of law. On January 27, 2012, 2012 WL 262532, this court issued its extensive Findings of Fact, Rulings of Law and Order of Judgment. (Docket No. 210). The court awarded Ford · damages in the amount of $47,500.00. With respect to injunctive relief, the court made the following finding:

> Because Ford has been released from the DDU and has been placed in the general prison population at SBCC, this court finds it unnecessary to grant his request for injunctive relief (1) enjoining the defendants from further violating his substantive and procedural due process rights through the imposition of unlawful or expired disciplinary sanctions; (2) directing the defendants to assist Ford in his transition from restrictive confinement in the DDU to prepare for his release from incarceration in April 2012; or (3) directing the defendants to provide Ford with individual counseling at least once a week for the remainder of his sentence. However, this court finds, consistent with the PLRA's directive, that Ford is entitled to relief in the form of an order (1) instructing the DOC to ensure that Ford has, and continues to have for the remainder of his sentence, opportunities to participate in any transitional programs that are available to general population inmates; and (2) directing the DOC to deem satisfied Ford's 10–year DDU sanction that was issued in 2002.

(Rulings of Law ¶ 35). Therefore, judgment entered in favor of the plaintiff and against the defendants in their individual and official capacities in the amount of $47,500, and an injunction issued "ordering (1) that the DOC shall ensure that Ford

has, and continues to have for the remainder of his sentence, opportunities to participate in any transitional programs that are available to general population inmates; and (2) directing the DOC to deem satisfied Ford's 10–year DDU sanction that was issued in 2002." (Docket No. 212).

The defendants filed a Motion to Alter Judgment on March 7, 2012, which was denied by the court on April 19, 2012, 2012 WL 1378651. (Docket Nos. 216, 223). The defendants have appealed the judgment and the matter is now pending in the First Circuit.

### The Fee Request

There were "numerous WilmerHale attorneys, summer associates, paralegals and staff" working on the case, totaling approximately 5,200 hours. (WilmerHale Mem. at 13). However, the firm is only seeking compensation for the hours worked by the so-called "Lead Associates," namely Timothy Syrett, Dimple Chaudhary and Michael Hoke. They are not seeking compensation for the work of Lisa Pirozzolo, a partner who oversaw the litigation and spent approximately 300 hours on the case, Emily Schulman, another partner who was part of the trial team and who dedicated approximately 170 hours to the case, and support staff. (*Id.*).

The Lead Associates billed 3,536 hours to the case. (*Id.*). In their fee petition, Wilmer Hale is seeking compensation for 2,039 hours. (*Id.* at 1). First, Wilmer-Hale reduced the Lead Associates' hours to 3,136.3 by removing time entries relating to work on claims in which Mr. Ford did not prevail.[1] The time sheets submitted by WilmerHale for this court's review are limited to these 3,136.3 hours. Then the firm reduced these hours by 35% "to further reduce the possibility of seeking fees for unsuccessful claims and to reach an amount proportionate to the relief obtained in this case." (*Id.* at 14–15). It has applied the rate of $169.50 per hour, which WilmerHale contends (and the defendants dispute) was the rate authorized under the PLRA in 2008. It has not sought the higher rates which would be allowable in subsequent years. (*Id.* at 15).

In accordance with the terms of its pro bono policy, any legal fees recovered will be applied to unreimbursed costs in this case and other pro bono matters in which the firm is involved. The firm will also donate a portion of its fees to the Prisoners' Legal Services, which assisted in the case. "WilmerHale will not retain any fees recovered through this petition as part of its general revenues." (*Id.* at 3–4).

### III. ANALYSIS

### A. General Standard for Awarding Fees

In accordance with the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, a "prevailing party" in a civil rights action "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Hensley v. Eckerhart,* 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983) (internal quotation and citation omitted). Reasonable costs also are recoverable under § 1988. *Palmigiano v. Garrahy,* 707 F.2d 636, 637 (1st Cir.1983). To be a prevailing party, the plaintiff must "succeed on any significant issue in litigation which achieves some of the benefit parties sought in bringing suit." *De Jesus Nazario v. Morris Rodriguez,* 554 F.3d 196, 197 (1st Cir.2009) (quoting *Hensley,*

---

1. The excluded claims include Mr. Ford's equal protection claims, ineffective assistance of counsel claim, and other claims based on violations of state statutes and regulations. (WilmerHale Mem. at 13–14; Chaudhary Decl. (Docket No. 214–1) ¶ 8).

461 U.S. at 433, 103 S.Ct. at 1939) (additional citation omitted). The standard to be applied in the instant case is defined by the "lodestar calculation" normally used to award attorneys' fees, as well as by the PLRA because Mr. Ford was a prisoner. *See* 42 U.S.C. § 1997e.

### *The Lodestar Calculation*

 The *De Jesus Nazario* court summarized the lodestar calculation as follows:

> The lodestar is determined by multiplying the number of hours productively spent by a reasonable hourly rate to calculate a base figure. In crafting its lodestar, the trial court may adjust the hours claimed to remove time that was unreasonably, unnecessarily or inefficiently devoted to the case, and subject to principles of inter-connectedness, the trial court may disallow time spent litigating failed claims. Finally, the trial court has the discretion to adjust the lodestar itself upwards or downwards based on several different factors, including the results obtained, and the time and labor required for the efficacious handling of the matter.
>
> In making this adjustment, the trial court should be mindful of the complexities of defining the results obtained. As we have already noted, in determining the quality of the plaintiff's results, we look to a combination of the plaintiff's claim-by-claim success, the relief achieved, and the societal importance of the rights vindicated. We have further noted that the computational principles employed to evaluate a skimpy damage award or shortfall in other relief are difficult to quantify, and have described a constellation of potential outcomes, and permissible attorney's fees calculations, under each. In particular, we have emphasized that though a meager damage award may be taken into consideration, the [Supreme] Court has squarely disclaimed the proposition that fee awards under § 1988 should be proportionate to the amount of damages a civil plaintiff actually recovers.
>
> Similarly, while a trial court can and should reduce the lodestar to disallow fees for time inefficiently, unnecessarily or unreasonably expended, it must also be mindful of the realities of modern litigation. It is of course true that each fee case generally rests on its own congeries of facts, but nevertheless, we have previously reversed decisions to substantially reduce hours allowed for pre-trial proceedings, where we have found that significant time was expended and the plaintiff was not responsible for the delay.... Thus, although it is possible, and indeed likely, that the district court may discount some of the time plaintiff's counsel spent in pre-trial proceedings, the district court should take care to excise only fat, leaving sinew and bone untouched. Beyond these general observations, we leave the determination of a reasonable fee to the sound discretion of the trial court.

554 F.3d at 207–08 (internal footnotes, citations and quotations omitted). The burden is on the party claiming fees to prove the reasonableness of the hours claimed. *Burke v. McDonald*, 572 F.3d 51, 63 (1st Cir.2009). While WilmerHale contends that the fee request has already been reduced to consider the lodestar factors, the defendants disagree. According to the defendants, not only are the time records insufficient to make the detailed analysis required under the lodestar approach, but the defendants contend that there is a significant amount of duplication and time spent on claims for which Ford did not prevail which should be discounted. This court's analysis under the lodestar method will be discussed below.

### Fees Under the PLRA

Because Mr. Ford was confined to a correctional facility at the time he brought his action, his award of attorneys' fees is governed by the PLRA, 42 U.S.C. § 1997e. As a general statement, the provisions of the PLRA which complement the lodestar method are as follows:

(d) Attorney's fees

(1) In any action brought by a prison who is confined to any jail, prison, or other correctional facility, in which attorney's fees are authorized under section 1988 of this title, such fees shall not be awarded, except to the extent that—

(A) the fee was directly and reasonably incurred in proving an actual violation of the plaintiff's rights protected by a statute pursuant to which a fee may be awarded under section 1988 of this title; and

(B)(i) the amount of the fee is proportionately related to the court ordered relief for the violation; or

(ii) the fee was directly and reasonably incurred in enforcing the relief ordered for the violation.

This court's analysis of this general provision will be discussed below. The PLRA also contains specific limitations on the amount of fees that can be awarded. The applicability of virtually each one of these limitations is disputed by the parties, and they will be discussed separately in the next section.

### B. Limitations Under the PLRA

#### Overall Cap on Fees

■ The PLRA contains a provision capping fees at 150% of the monetary

judgment awarded. Thus, 42 U.S.C. § 1997e(d)(2) provides:

Whenever a monetary judgment is awarded · . . . , a portion of the judgment (not to exceed 25 percent) shall be applied to satisfy the amount of attorney's fees awarded against the defendant. If the award of attorney's fees is not greater than 150 percent of the judgment, the excess shall be paid by the defendant.

This has been interpreted to mean that "the statute caps the defendants' liability for attorneys' fees at 150% of the judgment." *Boivin v. Black,* 225 F.3d 36, 38, 40 (1st Cir.2000) (noting that while the statute "is awkwardly phrased, its import and its essence are transparently clear"). The parties disagree as to whether this cap applies in the instant case. This court concludes that it does not.[2]

■ The courts addressing the issue have all determined that this cap has no application where the court has ordered non-monetary redress in the form of an injunction, along with the monetary judgment. *Id.* at 41 n. 4. "In such a 'hybrid' case,' the court [is] free to take into account all the provisions of section 1997e(d)." *Id. See also Dannenberg v. Valadez,* 338 F.3d 1070, 1074 (9th Cir. 2003), and cases cited ("In the context of prison litigation, which frequently involves constitutional challenges to prison conditions or practices for which the desired relief is primarily nonmonetary, a rule that tethered attorneys' fees solely to monetary relief would be difficult to square with the rest of section 1997e(d)."). Since Ford was awarded injunctive and monetary relief, the cap does not apply.

The defendants seek to avoid this conclusion on two grounds. First, they argue that "the Court committed a manifest er-

---

**2.** It is undisputed that if the cap applies, the award of legal fees would be limited to $71,250.00.

ror of law by ordering injunctive relief." (Defs. Mem. (Docket No. 221) at 7). That issue is presently before the First Circuit and will presumably be decided finally by that court. For the reasons detailed in this court's Findings and Rulings and denial of defendants' Motion to Vacate Judgment, this court concluded that injunctive relief was appropriate. It is not convinced otherwise at this time.

■ The defendants further assert that the instant case differs from *Boivin* in that the injunction issued in this case was allegedly to remedy a past constitutional violation, and not to stop a current and ongoing constitution violation. (Defs. Mem. at 8). Consequently, the defendants argue, the cap should apply. This argument fails for several reasons. First, no such distinction is made in *Boivin.* Relying on the language of the statute, the court found that the cap applies to the award of monetary damages only—the type of injunctive relief had no significance. Second, the injunctive relief ordered in this case included the order that Ford's DDU sanction be deemed to have been satisfied, which would have a prospective effect if he is incarcerated in the future. In *Dannenberg,* the trial court's injunction expunging materials related to an improper disciplinary report was sufficient to preclude the applicability of the 150% cap to the prisoner's request for fees. *See Dannenberg,* 338 F.3d at 1074. The same result should be reached here.

### Amount of Plaintiff's Contribution

■ The defendants argue next that 25% of the judgment awarded to Ford should be applied to any award of attorneys' fees. This argument is based on the language in 42 U.S.C. § 1997e(d)(2) that "a portion of the judgment (not to exceed 25 percent) shall be applied to satisfy the amount of attorney's fees awarded against the defendant." This court agrees with those courts which have found that "[t]he plain language of the 25–percent provision is unambiguous and does not support [the defendants'] reading. The statute does not compel district courts to apply 25 percent of the judgment to pay attorney's fees when the attorney's fee award exceeds that amount." *Parker v. Conway,* 581 F.3d 198, 204–05 (3d Cir.2009), and cases cited. In the instant case, based on the defendants' steadfast refusal to give Ford a hearing before putting him in the DDU, the fact that monetary damages can never fully compensate the plaintiff for the harm he suffered for being improperly housed in the DDU, and the significant constitutional rights which Ford has vindicated, this court orders that $1.00 of Ford's monetary judgment be applied to legal fees. *See Thompson v. Torres,* Civil Action No. 00–10981–RWZ, 2010 WL 4919058, at *2 (D.Mass. Nov. 29, 2010) (holding that "the determination as to how much of the [fee] award is paid out of the judgment is a matter of discretion[,]" and applying "the minimum $1 of the judgment toward the award of attorney's fees"); *Siggers–El v. Barlow,* 433 F.Supp.2d 811, 822–23 (E.D.Mich.2006) (finding that PLRA contribution requirement "does not provide courts with guidance for determining the percentage" of the plaintiff's contribution, and ordering plaintiff to pay $1 of $219,000 judgment, which included $200,000 in punitive damages).

### The Appropriate Hourly Rate

The parties dispute the appropriate hourly rate of compensation of the plaintiff's attorneys' work. 42 U.S.C. § 1997e(d)(3) states that the attorney's fees awarded under the PLRA cannot be "based on an hourly rate greater than 150 percent of the hourly rate" established by statute "for payment of court-appointed

counsel." At issue is whether the rate is based on the amount authorized by the Judicial Conference or the amount actually paid to court-appointed counsel in the district. Thus, the defendants argue that the plaintiff should be limited to the rate of $150/hour, since the actual rate paid to CJA counsel in this district in 2008 was $100 per hour. (Defs. Mem. at 17). Plaintiff, however, has used the rate of $169.50 per hour, that being 150 percent of the $113/hour authorized by the Judicial Conference for 2208. (WilmerHale Mem. at 12). In using that rate, plaintiff has foregone the increased rate to which counsel would be entitled in later years, during which higher CJA rates had been approved.[3] Recognizing that different courts have interpreted the statute differently, this court finds that the rate of $169.50 for all years would be appropriate.

 The issue has been fully addressed by Judge Stearns in *Hudson v. Dennehy*, 568 F.Supp.2d 125, 131–33 (D.Mass.2008). As detailed therein, "the statute is not written in terms of what was actually paid[,]" but rather "caps fees at 150 percent of the hourly rate established for payment of court-appointed counsel." *Id.* at 132. Based on the language of the statute, like Judge Stearns, this court will follow "the Sixth and Ninth Circuits in holding that the maximum hourly rate available to plaintiffs' counsel pursuant to the PLRA is 150 percent of the Judicial Conference's rate of $113, or $169.50 per hour." *Id.* at 133. The court accepts WilmerHale's offer to apply that rate to all the years at issue in this fee petition.

### Calculation of Compensable Hours

As detailed above, the court generally applies the lodestar approach modified by the PLRA in determining the appropriate number of compensable hours. This matter is made somewhat more complicated in the instant case because the court has not been presented with all the time records. Rather, WilmerHale only has submitted the time records for 3,136.3 hours, which the firm contends has already been reduced for unsuccessful claims. This has made it harder for the court to evaluate the requested time charges in context, or to reconcile many of the charges with specific pleadings. It also has made it impossible to reduce any fee award based on the percentage of claims which were unsuccessful, as defendants argue, since those hours have already been eliminated. While as a general statement this court finds the time records to be sufficiently detailed, the fact that they have been edited already makes it more difficult to follow the overall course of the litigation. Similarly complicating this court's analysis is the fact that the defendants have not provided time charges for entries to which they object; rather, they just list entries by dates. Moreover, some of these citations to dates are incorrect. What follows, then, is this court's best calculation of amounts charged to specific tasks which the court has found to be non-compensable.

 As detailed above, recovery is limited under the PLRA to fees that were "directly and reasonably incurred in proving an actual violation of the plaintiff's rights protected by a statute[.]" Moreover, under the lodestar method, this court shall disallow time spent litigating failed claims, and shall eliminate time spent inefficiently, unnecessarily or unreasonably. After an extensive analysis of the records submitted, this court concludes that the

---

**3.** 150% of subsequent CJA rates would have yielded $177/hour in 2009, $208.50/hour in 2010, and $211/hour in 2011. (WilmerHale Mem. at 15–16).

following time is not appropriately compensated under this fee petition.

a. In preparing for the summary judgment argument, the three counsel spent a total of approximately 124 hours. This court finds this amount of time to be excessive, and will discount those hours by 50%, reducing the fee petition by 62 hours.

b. Counsel devoted approximately 86 hours in connection with defending Ford against the new charges which resulted in the 10 month DDU sentence in 2010 following this court's summary judgment ruling. Since that time was not directly incurred in proving the violation of Ford's constitutional rights, it is not compensable.

c. Counsel devoted approximately 50 hours in connection with the unsuccessful motion seeking court oversight of the disciplinary proceedings brought against Ford. Again, this time is not compensable as the motion was not successful and was not directly related to proving the constitutional violation.

d. Counsel devoted approximately 78 hours to mediation efforts which were not successful and which were not directly related to proving the constitutional violation. Therefore, this time is not compensable.

e. Approximately 42 hours were spent bringing Attorney Chaudhary up to speed after Attorney Hoke left the firm. This time should not be charged to the defendants.

f. Approximately 34 hours were spent in connection with a proposed motion to increase Ford's telephone access with counsel. Since this motion was not pursued, and was not directly related to proving the constitutional violation, this time will not be compensated herein.

g. The defendants have identified approximately 17 hours spent in connection with issues not related to the constitutional violations and/or spent in connection with claims against other defendants. This time includes withdrawing duplicative motions filed with the court (1.4 hours), dismissing non-DOC defendants (4.2 hours), research filing with the state court (3.4 hours), sending letters to other attorneys (.4 hours), or researching the use of plaintiff's deposition at trial (7.9 hours).

After subtracting all these hours from the original 3,136.3 hours, 2,767 hours remain.

■■ WilmerHale has proposed reducing its hours by 35% to account for other duplication. This court concludes that a 45% reduction is more appropriate. A review of the time sheets shows that for every significant communication, pleading or event in the case, counsel reported to numerous other counsel and time was charged for each such internal communication. In addition, there were numerous internal meetings for which multiple attorneys billed time. Several attorneys reviewed and edited each pleading, so time was charged for editing and rewriting multiple times. While this court recognizes that this *pro bono* litigation was an excellent learning opportunity, the time spent was excessive.

■■ Reducing 2,767 hours by 45% leaves 1,521.85 hours of compensable time. At the rate of $169.50 per hour, the amount of compensable fees is $257,953.57, which this court rounds to $258,000.00. The costs being sought of $20,456.36 are not in dispute. This court also finds that $258,000 in legal fees is appropriate given the scope of the litigation, and is proportionately related to the relief afforded Ford. Six times the amount of the monetary award is not excessive given the significant constitutional issues involved here.

Finally, the $258,000 in fees is commensurate with the amount of work needed to bring this case to resolution. The fact discovery was appropriate in scope and necessary to all the legal claims presented. The core issue throughout the case remained the same—whether Ford was appropriately detained in the DDU for years without a hearing for a disciplinary infraction. Although a number of legal theories were proffered, they were all premised on a common nucleus of facts. In addition, there were several rounds of summary judgment pleadings, a three day trial, and extensive post-trial pleadings involving difficult and complex legal issues. Under such circumstances, this court finds the amount of $258,000 to be appropriate.

### ORDER

For all there reasons detailed here, Plaintiff's Motion for Attorneys' Fees and Bill of Costs (Docket No. 213) is ALLOWED in part. WilmerHale is awarded fees in the amount of $258,000 and costs of $20,456.36.

### MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTION FOR STAY OF EXECUTION PENDING APPEAL AND FOR WAIVER OF BONDS

### I. INTRODUCTION

This matter is before the court on the defendants' "Motion for a Stay of Execution Pending Appeal and for Waiver of Bonds" (Docket No. 231), by which the defendants are seeking a stay of execution of the judgment of the District Court, pending a decision on their appeal to the Court of Appeals for the First Circuit. In addition, the defendants request that no bond or other security be required.

After consideration of the parties' written submissions and oral arguments, the motion was ALLOWED in open court on November 27, 2012, subject to the condition that the Commonwealth of Massachusetts file an affidavit attesting that it unequivocally assumes the obligation to satisfy any judgment against Messrs. Bender and St. Amand, including any award of attorneys' fees and costs, as authorized by Mass. Gen. Laws ch. 258, § 9,[1] despite the fact that the defendant officials have since retired from service. Moreover, the Commonwealth will confirm therein that it will not claim that the named defendants "acted in a grossly negligent, willful or malicious manner," thereby excusing its obligation to indemnify under the statute. This Memorandum of Decision and Order is being entered to address the arguments raised by the parties in their pleadings.

### II. ANALYSIS

Federal Rule of Civil Procedure 69 sets the applicable procedure for enforcement

---

1. Mass. Gen. Laws ch. 258, § 9 provides that "[p]ublic employers may indemnify public employees, and the commonwealth shall indemnify persons holding office under the constitution, from personal financial loss, all damages and expenses, including legal fees and costs, if any, in an amount not to exceed $1,000,000 arising out of any claim, action, award, compromise, settlement or judgment by reason of an intentional tort, or by reason of any act or omission which constitutes a violation of the civil rights of any person under any federal or state law, if such employee or official or holder of office under the constitution at the time of such intentional tort or such act or omission was acting within the scope of his official duties or employment. No such employee or official, other than a person holding office under the constitution acting within the scope of his official duties or employment, shall be indemnified under this section for violation of any such civil rights if he acted in a grossly negligent, willful or malicious manner."

of a money judgment. Rule 69 states in relevant part:

A money judgment is enforced by a writ of execution, unless the court directs otherwise. The procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—*must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies.*

Fed.R.Civ.P. 69(a)(1) (emphasis added).

 The defendants contend that state law governs the issuance of the execution in this case, and that Mass. Gen. Laws ch. 235, § 16 precludes the issuance of an execution upon a judgment "until the exhaustion of all possible appellate review thereof[.]" Therefore, the defendants argue, no execution should issue. This argument is without merit. Since there is a federal statute that governs the issuance of an execution, Mass. Gen. Laws ch. 235, § 16 does not apply in the instant case.

It is well established that the Federal Rules of Civil Procedure "qualify as federal statutes" under Rule 69(a). *Office Depot Inc. v. Zuccarini*, 596 F.3d 696, 701 (9th Cir.2010), and cases cited. Fed.R.Civ.P. 62(a) governs the issuance of an execution and provides:

Except as stated in this rule, no execution may issue on a judgment, nor may proceedings be taken to enforce it, *until 14 days have passed after its entry.* But unless the court orders otherwise, the following are not stayed after being entered, even if an appeal is taken:

(1) an interlocutory or final judgment in an action for an injunction or a receivership; or

(2) a judgment or order that directs an accounting in an action for patent infringement.

(Emphasis added). This Federal Rule, which differs from Massachusetts law, controls. *See Elias Bros. Rests., Inc. v. Acorn Enters., Inc.*, 931 F.Supp. 930, 938, 939 (D.Mass.1996) (Fed.R.Civ.P. 62(a) governing the issuance of an execution and requirement of a bond controls overs Massachusetts rule precluding issuance of execution until time for appeal has expired).[2] *See also Schneider v. Nat'l R.R. Passenger Corp.*, 72 F.3d 17, 19 (2d Cir.1995) (Federal "Rule 69(a) adopts state procedures for execution only to the extent that they do not conflict with any applicable 'statute of the United States.' This term includes the Federal Rules of Civil Procedure, since they have the force and effect of federal statutes.").

The cases relied on by the defendants do not compel a different result. *Whitfield v. Municipality of Fajardo*, 564 F.3d 40, 42–43 (1st Cir.2009), relates to the enforcement of "an idiosyncratic Puerto Rico indemnity law" which apparently does not conflict with any federal rule or statute. Moreover, the *Whitfield* court concluded that it lacked jurisdiction to review the District Court's nonfinal order relating to efforts undertaken to collect a judgment, so it did not address the merits of the dispute. Similarly, *Gabovitch v. Lundy*, 584 F.2d 559, 561 (1st Cir.1978), addresses the need to follow state process in attaching a bank account. It also does not address the situation before this court involving conflicting federal and state statutes. For the reasons detailed herein, the parties' rights and obligations with respect to an execution are governed by Fed.R.Civ.P. 62(a).

---

**2.** Although *Elias* relied on an earlier version of Fed.R.Civ.P. 69(a), the subsequent amendments were merely stylistic. *See* Advisory Comm. Note (2007); *Zuccarini*, 596 F.3d at 700 n. 1.

Fed.R.Civ.P. 62(d) provides in relevant part that "[i]f an appeal is taken, the appellant may obtain a stay by supersedeas bond. . . . The stay takes effect when the court approves the bond." *See also* Fed. R. App. P. 7 ("the district court may require an appellant to file a bond or provide other security . . . to ensure payment of costs on appeal"); Fed. R. App. P. 8(a)(1) (party must first seek a stay or approval of a supersedeas bond in the district court). The defendants argue that this court should consider the four factors enunciated in *Hilton v. Braunskill*, 481 U.S. 770, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987), to support a stay of execution without a bond pending appeal. In *Hilton*, the court addressed a stay of execution in a case granting habeas relief and ruled that the court should "follow the general standards for staying a civil judgment[,]" namely, "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether the issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 775–76, 107 S.Ct. at 2118–19. However, this is "the traditional standard for issuing injunctions" and while it is "arguable that a monetary judgment may also be stayed under" this standard, "[s]tays of monetary judgments are ordinarily sought under either Fed.R.Civ.P. 62(d) [Stay with Bond on Appeal] or 62(f) [Stay in Favor of a Judgment Debtor Under State Law]." *Acevedo–Garcia v. Vera–Monroig*, 296 F.3d 13, 17 & n. 4 (1st Cir.2002). *See also Schreiber v. Kellogg*, 839 F.Supp. 1157, 1161 (E.D.Pa.1993), and cases cited (holding that the four part test applies to injunctions and "is not applicable to a motion for a stay under rule 62(d)"). Therefore, it is questionable whether *Hilton* applies in the instant case.

This issue does not have to be resolved, however, because this court concludes that a supersedeas bond will not be required if the Commonwealth files the affidavit ordered above. "Courts have held that no bond is required if: (1) the defendant's ability to pay is so plain that the posting of a bond would be a waste of money. . . ." *Acevedo–Garcia*, 296 F.3d at 17. Even in such a case, however, it is appropriate for the court to require "adequate documentation" to support the claim of ability to pay. *See id.* and cases cited. This court will accept the affidavit of the Commonwealth as adequate proof that any judgment will be satisfied.

## III. *ORDER*

For the reasons detailed herein, the defendants' "Motion for a Stay of Execution Pending Appeal and for Waiver of Bonds" (Docket No. 231) is ALLOWED, subject to the condition that the Commonwealth of Massachusetts file an affidavit attesting that it unequivocally assumes the obligation to satisfy any judgment against Messrs. Bender and St. Amand, including any award of attorneys' fees and costs, as authorized by Mass. Gen. Laws ch. 258, § 9, despite the fact that the defendant officials have since retired from service. Moreover, the Commonwealth will confirm therein that it will not claim that the named defendants "acted in a grossly negligent, willful or malicious manner," thereby excusing its obligation to indemnify under the statute. The affidavit shall be filed by December 7, 2012.